(No. 53799

METROPOLITAN SANITARY DISTRICT OF GREATER CHICAGO *ex rel.* WILLIAM F. O'KEEFFE, Appellee, v. INGRAM CORPORATION *et al.,* Appellees (The Metropolitan Sanitary District of Greater Chicago, Appellee; The Metropolitan Sanitary District of Greater Chicago *ex rel.* Aram A. Hartunian, Appellant).

*Opinion filed June 4, 1981.—Rehearing denied October 19, 1981.*

460

Aram A. Hartunian, of Chicago (Pressman & Hartunian, of counsel), *pro se.* A. Denison Weaver, of Chicago, for appellee William F. O'Keeffe.

Sonnenschein, Carlin, Nath & Rosenthal, of Chicago, for appellee Ingram Corporation *et al.*

MR. JUSTICE CLARK delivered the opinion of the court:

On April 18, 1979, the Cook County circuit court awarded petitioner A. Denison Weaver "the sum of $900,000.00 as and for attorney's fees" and "$16,842.30 for the expenses incurred" on behalf of "the taxpayer William F. O'Keeffe," and awarded petitioner George J. Cullen "$60,000.00 for services rendered on behalf of the taxpayer as co-counsel." Taxpayer O'Keeffe had instituted a derivative suit on behalf of the Metropolitan Sanitary District of Greater Chicago (MSD) against the Ingram Corporation and various related persons and entities (Ingram), in December 1975. The suit was brought under sections 11.18 and 11.22 of the Purchasing Act for the Metropolitan Sanitary District of Greater Chicago (the Purchasing Act or the Act) (Ill. Rev. Stat. 1971, ch. 42, pars. 331.18, 331.22). This suit and related actions filed by the MSD in Federal and State courts were settled. On May 17, 1979, Aram A. Hartunian, *pro se,* attempted to appeal the attorney fee award derivatively on behalf of the MSD.

As part of the settlement, the MSD had agreed not to appeal the fee award, and it refused Hartunian's demand to appeal. The appellate court held that Hartunian lacked standing to appeal (85 Ill. App. 3d 859), and we granted leave to appeal. We reverse.

A contract to haul sludge, negotiated by the purchasing agent of the MSD on a noncompetitive-bid basis, was awarded to Ingram on May 12, 1971. In 1974, a Federal grand jury began investigating the circumstances under which the contract was awarded. The MSD's records were subpoenaed. Trustees, officers, and employees of the MSD appeared before the grand jury and testified. In late 1975, William F. O'Keeffe, a lawyer and MSD taxpayer, heard "[r]umors on the street" to the effect that the contract was let illegally, and published reports of the grand jury investigation appeared soon thereafter. He retained counsel and filed a complaint for declaratory judgment in the United States District Court for the Northern District of Illinois and in the circuit court of Cook County. The gravamen of the complaint was that the contract to haul sludge had been awarded in violation of section 11.18 of the Purchasing Act, which read, in pertinent part:

"All officers and employees [of the MSD] are expressly prohibited from accepting, directly or indirectly, from any person, association or corporation to which any purchase order, lease or contract may be awarded, any rebate, gift, money, or anything of value." (Ill. Rev. Stat. 1971, ch. 42, par. 331.18.)

Section 11.22 of the Act provides that "[a]ny purchase order or contract executed in violation of this Act shall be null and void." (Ill. Rev. Stat. 1971, ch. 42, par. 331.22.) The complaint averred that plaintiff was an MSD taxpayer and sought the return of all money Ingram had been paid pursuant to the contract. That sum was approximately $24 million.

The complaint was defective in several respects. The MSD was not made a party defendant. The complaint did

not aver that the MSD was unwilling to sue Ingram for this violation. Nor did the complaint aver that O'Keeffe had asked the MSD to sue or why O'Keeffe had not asked the MSD to sue. Copies of the complaint, however, were sent to the MSD on December 29, 1975.

Proceedings were begun by the Illinois Commerce Commission on December 30, 1975, related to Ingram's alleged tariff overcharges on the same contract, and the MSD hired special counsel, Aram A. Hartunian, in January 1976, to secure an adjustment on the tariff charged by Ingram. The MSD, represented by Hartunian, filed suit in March 1976 in the United States District Court for the Northern District of Illinois (Metropolitan Sanitary District of Greater Chicago v. Ingram Corp. *et al.,* No. 76 C 1009). The gist of this action was that Ingram overcharged the MSD, breaching the contract.

The grand jury, in that same month, returned a 39-count, 66-page indictment against, variously, the president and the chairman of the board of Ingram Corporation, E. Bronson Ingram and Frederic B. Ingram, respectively, MSD trustees Valentine J. Janicki and Chester P. Majewski, the general superintendent of the MSD, Bart T. Lynam, and other individuals, the names and positions of whom are irrelevant. If convictions were had on the indictments, a violation of section 11.18 would have been established.

Ingram had originally assigned the contract to an Illinois Ingram subsidiary corporation. The assertion of Federal jurisdiction, accordingly, was problematic, and O'Keeffe nonsuited the Federal case on August 3, 1976. Repeated difficulties in obtaining jurisdiction over the Ingram individual defendants and obtaining discovery against them occupied O'Keeffe for the rest of the year.

O'Keeffe and the MSD had an arrangement whereby O'Keeffe would keep the MSD apprised of the status of his suit. One such letter was sent to the MSD on March 5, 1976. On January 17, 1977, however, the MSD, in re-

sponding to another O'Keeffe letter, advised him that it regarded "the O'Keeffe suit as being neither authorized by us nor necessary at this time. The [MSD] has this situation under review and will, at the appropriate time, enforce any rights which we may have under [the Purchasing Act] ***." The letter continued, however, stating that the MSD intended "to be cooperative in responding to any request by you [O'Keeffe] for assistance. We hope that you will keep us informed of the status of the case. ***" O'Keeffe's counsel argued in a responsive letter that the MSD's position was inconsistent with his position, for the MSD's actions in Federal court were predicated on the validity of the contract, and noted that he never requested authorization for the suit in part because the chief administrative officer and chairman of the judiciary committee of the MSD were under indictment.

Hartunian, on March 1, 1977, filed a motion to quash deposition subpoenaes directed to the MSD's attorney by O'Keeffe and Ingram. The deposition was ordered to be taken, however, and two days after it was taken, Hartunian resigned as the MSD's special counsel, citing adverse media publicity. A new firm, Jerome H. Torshen, Ltd., was engaged one week later.

For the next several months, problems of discovery occupied the parties. After the Ingram individuals, one MSD trustee, and others not relevant here, were convicted in the Federal criminal case in November 1977, the MSD amended its Federal-court complaint to include a count based on Ingram's alleged Purchasing Act violations. A separate suit in the same cause of action was filed by the MSD in circuit court (Metropolitan Sanitary District of Greater Chicago v. Ingram Corp. *et al.,* No. 77 L 24930).

On January 3, 1978, the MSD moved to appear as *amicus curiae* in the O'Keeffe suit, for the purpose of suggesting O'Keeffe's lack of standing. This motion was denied. On January 20, 1978, the MSD's motion to inter-

vene in the O'Keeffe suit pursuant to section 26.1 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 26.1) was granted.

In February 1978 the Federal district court denied O'Keeffe's petition to intervene under Federal Rule 24 (Fed. R. Civ. P. 24). The court found that the MSD's suit was being "vigorously prosecuted." This ruling was affirmed from the bench by the Seventh Circuit Court of Appeals.

In March 1978 O'Keeffe amended his complaint, setting forth reasons why he could maintain his action despite his failure to demand that the MSD sue Ingram. On May 12, 1978, the trial court, after an extensive hearing on the issue of O'Keeffe's standing, ruled that a demand upon the MSD to sue would have been useless, and held that O'Keeffe had standing. The MSD unsuccessfully sought review of this ruling in the appellate court and in this court.

On May 17, 1978, the MSD filed a motion for summary judgment in Federal court on the Purchasing Act count of its complaint. In October 1978 O'Keeffe also moved for summary judgment in the circuit court. In March 1979 O'Keeffe was given leave to withdraw this motion and the case was set for trial in May. On April 4, 1979, however, O'Keeffe petitioned the court to approve a settlement. In pertinent part this verified petition stated:

> "That during the pendency of this litigation and at the suggestion of this Honorable Court, the parties hereto engaged in negotiations for the purpose of determining whether a common ground existed upon which a settlement of all disputes between MSD and Ingram relating to MSD's sludge removal program could be resolved. That pursuant to said negotiations, on March 30, 1979, an agreement was reached to settle this and all other litigation between the MSD and Ingram, subject to the approval of this Court, on the terms and conditions as stated in the form of Settlement Agreement attached hereto whereby:
>
> (a) Ingram will pay to MSD the sum of

$8,250,000. In addition, Ingram will relinquish any claims which it might have to recover any sum of money from MSD, said claims being in the approximate amount of $3,500,000.

(b) MSD has agreed to pay your Petitioner's attorneys' fees and expenses out of the funds recovered in such sum as awarded by this Court upon a petition to be filed by Petitioner's counsel and after hearing in open court. MSD reserves the right to contest said petition at said hearing, but both your Petitioner and MSD have agreed to waive their respective rights of appeal from any order entered pursuant to said fee petition. MSD has further agreed not to contest Petitioner's standing. Petitioner has agreed with MSD that MSD's net cash recovery after the payment of Petitioner's attorneys' fees and expenses shall not be less than $7,250,000.

(c) All parties agree that upon the approval of this petition, they will execute a Release in the form attached hereto.

The foregoing settlement proposal has been duly considered by Ingram, MSD's Board of Commissioners and your Petitioner, all of whom have accepted said proposal, subject to this Court's approval."

The circuit court approved the settlement and established a schedule for the filing and a hearing on the fee petition. Jurisdiction was retained to fix the amount of attorney fees, but subject to that, the cause was dismissed with prejudice. On April 5 and 6, 1979, the Federal district court case and the MSD's circuit court action were dismissed with prejudice. Ingram delivered a cashier's check for $8,250,000 to the MSD. On April 9, 1979, the circuit court dismissed O'Keeffe's cause of action against defendants with prejudice. On April 18, 1979, the trial court, after an evidentiary hearing, awarded $960,000 in fees and $16,842.30 in costs to be paid by the MSD. On April 19, 1979, the MSD approved this fee award and directed that it be paid.

Hartunian subsequently informed the MSD that he was disturbed by the fee award and stated his intention to ap-

peal the award in the absence of such action by the MSD. The MSD refused to appeal and Hartunian filed his derivative notice of appeal on May 17, 1979. The MSD has refused to issue a check for the fees until this matter is resolved on appeal. There was some confusion among the parties, originally, regarding the scope of the purported appeal, but it is now clear that Hartunian is challenging only the fee award, and that part of the settlement agreement related to it. For that reason, Ingram has moved that it be dismissed from the action. Ingram has also filed a brief on the merits.

Taxpayer Hartunian initially argues that the award of attorney fees to O'Keeffe's counsel was unauthorized because O'Keeffe had no standing to sue. Taxpayer O'Keeffe argues that taxpayer Hartunian has no standing to appeal. We consider first the status of taxpayer O'Keeffe.

Section 11.22 of the Purchasing Act (Ill. Rev. Stat. 1971, ch. 42, par. 331.22) authorizes taxpayer suits: "Public funds which have been expended *** [in violation of the Act] , may be recovered in the name of the sanitary district in any court of competent jurisdiction." This provision allows citizen access to judicial forums to enforce causes of action when public-official fiduciaries neglect or refuse to do so. No other remedy is as "direct, speedy and efficacious." *Colton v. Hanchett* (1852), 13 Ill. 615, quoted in *Droste v. Kerner* (1966), 34 Ill. 2d 495, 506 (Schaefer, J., dissenting); see also *People v. Holten* (1919), 287 Ill. 225; *City of Chicago ex rel. Cohen v. Keane* (1976), 64 Ill. 2d 559; see generally Comment, *Taxpayers' Suits: A Survey and Summary,* 69 Yale L.J. 895 (1960); 18 McQuillan, Municipal Corporations secs. 52.01 through 52.52 (3d ed. 1977); 74 Am. Jur. 2d *Taxpayers' Actions* (1974).

The crux of Hartunian's argument, however, is that O'Keeffe neither asked the MSD to sue Ingram nor demonstrated that such a request would have been futile. (A

secondary argument—that O'Keeffe did not, as required, join the MSD as a party defendant—we need not address, because the MSD did ultimately intervene and become a party.) This requirement is a precondition of taxpayer actions. (*People ex rel. City of Chicago v. Schreiber* (1944), 322 Ill. App. 452, 483; see 74 Am. Jur. 2d *Taxpayers' Actions* sec. 31 (1974).) Hartunian has cited cases in which corporation motions to dismiss shareholder derivative actions were granted for failure to demonstrate, in the complaint, that a majority of corporate directors would fail to enforce the corporate cause of action, if called upon. (See, *e.g., Brooks v. American Export Industries, Inc.* (S.D.N.Y. 1975), 68 F.R.D. 506; *Abrams v. Mayflower Investors, Inc.* (N.D. Ill. 1974), 62 F.R.D. 361; see Annot., 99 A.L.R.3d 1034 (1980).) The analogy is urged because only two of the nine MSD trustees were indicted.

We find those cases inapplicable, for the MSD here, knowing of the O'Keeffe suit, did not seek to intervene and dismiss his action for more than two years, and, meanwhile, had requested O'Keeffe to periodically apprise them of the suit's status. The private letter to O'Keeffe in January 1977 advising him that his suit was "unauthorized" cannot, for obvious reasons, substitute for appropriate action in court. When the MSD finally filed a motion to intervene and dismiss O'Keeffe, the trial court appropriately held a hearing (*cf. DePinto v. Provident Security Life Insurance Co.* (9th Cir. 1963), 323 F.2d 826, *cert. denied* (1964), 376 U.S. 950, 11 L. Ed. 2d 969, 84 S. Ct. 965) and appropriately decided on the basis of the whole record not to eliminate the taxpayer from the suit. *Green v. Jones* (1924), 164 Ark. 118, 124, 261 S.W. 43, 45. *Cf. Palmer v. Morris* (5th Cir. 1965), 341 F.2d 577 (*per curiam*).

Hartunian argues that the MSD "prudently" decided to await the outcome of the Federal criminal case before suing Ingram. The short answer is that this argument

admits that an original demand upon the MSD to sue would have been futile. Neither section 11.22 of the Act nor prior case law required O'Keeffe to wait until the conclusion of the criminal case to ascertain whether the MSD would follow through in accordance with its belated and ambiguous private assurances. If the MSD was willing to sue Ingram, that willingness should have been promptly brought to the attention of the trial court.

The two years prior to the conclusion of the criminal case were not wasted years. Motions, pleadings, and discovery, however time-consuming, are integral parts of litigation. O'Keeffe cannot be faulted on account of, in Hartunian's words, procedural squabbles occurring during this time, for many of those squabbles were initiated by Ingram, obviously interested in fully litigating a lawsuit with a potential liability of many millions of dollars. Some of the squabbles, moreover, were initiated by the MSD, for reasons not fully or adequately explained. We therefore defer to the trial court's determination that keeping O'Keeffe in the case helped assure that the public interest in the case was fully represented. We also wonder, as did the trial court, what the obstacle was to the MSD and O'Keeffe jointly litigating the case against Ingram, once the MSD decided that it, too, was interested in pursuing Ingram for the alleged Purchasing Act violations.

A necessary predicate to the trial court's conclusion, which we have now approved, that O'Keeffe had standing, was that there were grounds to believe that the MSD was inadequately protecting the public interest. It is puzzling, therefore, that O'Keeffe suggests, as one reason for dismissing Hartunian's appeal, that the MSD validly bound all taxpayers by its agreement, in advance of the determination, not to appeal the fee award. Nevertheless, it is true that courts favor settlements. Agreements and consent decrees generally are enforced according to their terms. A long-standing exception has existed, however, for agree-

ments which are contrary to public policy. *Massell v. Daley* (1949), 404 Ill. 479.

Several sources of public policy persuade us that the agreement to forgo an appeal should not be enforced here. First, the protections afforded in two similar areas of the law, class actions and shareholder derivative actions, were absent in this proceeding. Second, the taxpayers were not adequately represented at the fee-determination proceeding. Third, this court has a policy of refusing to enforce the terms of settlement agreements which disadvantage unincluded parties.

Although class actions represent the aggregation of private causes of action (in contrast to a derivative suit), the representative character of the suit and the fiduciary nature of the relationship between the class representative and absent parties who will be bound by the outcome provide a clear analogy to taxpayer actions. Settlements in Federal and State courts generally are preceded by notice to the class of the settlement's terms. (Fed. R. Civ. P. 23; Ill. Rev. Stat. 1977, ch. 110, par. 57.7.) Those opting in to a settlement agreement are permitted to appeal on the question of its adequacy whether or not they have signed waiver forms giving up that right as a condition to opting in. (*Pettway v. American Cast Iron Pipe Co.* (5th Cir. 1978), 576 F.2d 1157, *cert. denied* (1979), 439 U.S. 1115, 59 L. Ed. 2d 74, 99 S. Ct. 1020; see also *Ace Heating & Plumbing Co., Inc. v. Crane Co.* (3d Cir. 1971), 453 F.2d 30.) Some Federal courts have appointed guardians *ad litem* to protect the interests of absent class members at a fee-determination proceeding. (*Haas v. Pittsburgh National Bank* (W.D. Pa. 1977), 77 F.R.D. 382, and case therein cited.) It has been held that courts should insist on the settlement of the damage aspect of the case prior to any attorney fees determination. *Prandini v. National Tea Co.* (3d Cir. 1977), 557 F.2d 1015.

The analogy between shareholder and taxpayer deriva-

tive suits, though imperfect, was recognized as early as 1871 in this State and has been maintained since then. (*Sherlock v. Village of Winnetka* (1871), 59 Ill. 389, 398; *City of Chicago ex rel. Cohen v. Keane* (1976), 64 Ill. 2d 559, 568.) The actions are similar in that they each are based upon a combination of two causes of action: one against the directors or public officials for failing to sue and the other based upon the cause of action belonging to the corporation or governmental body. Recovery runs in favor of the corporation or governmental entity, which is why they are necessary parties to these suits. The suing taxpayer or shareholder represents absent members of his class, who are bound by final judgment or decree. A fiduciary duty is owed by the representative to these absent parties. See *Ross v. Bernhard* (1970), 396 U.S. 531, 24 L. Ed. 2d 729, 90 S. Ct. 733; *Cohen v. Beneficial Industrial Loan Corp.* (1949), 337 U.S. 541, 549, 93 L. Ed. 1528, 1538, 69 S. Ct. 1221, 1227; *Clayton v. Mimms & Co.* (1979), 68 Ill. App. 3d 443; Prunty, *The Shareholders' Derivative Suit: Notes on Its Derivation,* 32 N.Y.U. L. Rev. 980 (1957); Comment, *Taxpayers' Suits: A Survey and Summary,* 69 Yale L.J. 895 (1960) (noting also the analogy's imperfections).

Shareholder derivative suits are litigated frequently in Federal court, and several principles applied there are worthy of note. Notice of proposed settlements is sent to all shareholders. (Fed. R. Civ. P. 23.1; compare C.W. Murdock, The Illinois Business Corporation Act Annotated sec. 45(a) (3d ed. 1975).) Objectors, summoned by the trial court's notice to state their case, are allowed reasonable discovery (*Girsh v. Jepson* (1975), 521 F.2d 153, 156-57) and are allowed to contest the reasonableness of the settlement on appeal (*In re Pittsburgh & Lake Erie R.R. Co. Securities & Antitrust Litigation* (3d Cir. 1976), 543 F.2d 1058). These provisions are a clear outgrowth of the fears prompted by the uncertain positions of set-

tling parties in a derivative suit regarding attorney fees. McLaughlin, *Capacity of Plaintiff-Stockholder to Terminate a Stockholder's Suit,* 46 Yale L.J. 421 (1936); C. W. Murdock, The Illinois Business Corporation Act Annotated sec. 45(a) (3d ed. 1975).

Conflicting loyalties were present in the instant case. O'Keeffe was allowed to sue because the MSD inadequately represented the interests of the taxpayers. No change in the MSD occurred between the time its motion to dismiss O'Keeffe was denied and the time of the settlement to persuade us that we should defer to the MSD's judgment on behalf of the taxpayers, regarding the decision not to appeal the attorney fees award. O'Keeffe's counsel, perhaps more significantly, could not validly represent the taxpayers regarding his own fee. See *Barliant v. Follett Corp.* (1978), 74 Ill. 2d 226.

Public policy is traditionally found primarily in the Constitution and statutes and only secondarily in case law. Nevertheless, in *Popovich v. Ram Pipe & Supply Co.* (1980), 82 Ill. 2d 203, this court declined to enforce a settlement agreement according to its terms where such enforcement would have violated the long-standing policy against double recoveries. The prohibition against double recovery is one found in our case law. The companion case, *Palmer v. Avco Distributing Corp.* (1980), 82 Ill. 2d 211, noted, in addition, the problem with settlement agreements that prejudice unincluded parties.

Here, the advance agreement not to appeal the attorney fees award was made by parties inadequately representing absent taxpayers. It was intended, nevertheless, for the taxpayers to have been bound by the judgment entered. They had no advance notice of what the settlement entailed or how they could register a protest. (It is not clear that, and we do not decide whether, Hartunian could have intervened after the entry of the decree (see *Lenhart v. Miller* (1940), 375 Ill. 346; Annot., 69

A.L.R.2d 562 (1960).) There is no justifiable reliance on O'Keeffe's part, upon the agreement not to appeal his fee, for his conclusion that the settlement's damage figure was reasonable and that the litigation should cease could not depend upon the amount of his fee.

In the *Pettway* class action case (*Pettway v. American Cast Iron Pipe Co.* (5th Cir. 1978), 576 F.2d 1157, *cert. denied* (1979), 439 U.S. 1115, 59 L. Ed. 2d 74, 99 S. Ct. 1020) previously cited, the court held that "[r]equiring claimants to opt into a back pay subclass before they have an opportunity to seek appellate review of the settlement would be inconsistent with the design of Rule 23(e), which bounds the court's discretion in approving proposed settlements. Subclass members have an interest in ensuring that a settlement is reviewed by the district court in conformity with settled legal standards, and we will not allow subversion of the protections afforded by Rule 23(e) by requiring claimants to opt-out of a settlement in order to obtain appellate review." (576 F.2d 1157, 1182.) The instant agreement not to appeal affects taxpayers in the same way, for to gain the benefits of a settlement, they were required to give up their interest in having the award of attorney fees decided "in conformity. with settled legal standards." As the court in *Pettway* would not permit the subversion of Rule 23(e), we will not allow the subversion of our prior cases in which the appropriate standards for fee awards were articulated.

For the foregoing reasons, we decline to enforce the agreement not to appeal.

O'Keeffe argues that the MSD, through Hartunian, is estopped from challenging the fee award under the settlement because it has accepted payment from Ingram. The fee award is severable, however, and O'Keeffe's counsel have not been prejudiced, for reasons we have just explained. This principle, therefore, is inapplicable. *Layfer v. Tucker* (1979), 71 Ill. App. 3d 333, 337; *Reinken v.*

*Reinken* (1933), 351 Ill. 409; compare *County of Cook v. Malysa* (1968), 39 Ill. 2d 376; see generally, *Morton Grove Park District v. American National Bank & Trust Co.* (1980), 78 Ill. 2d 353, 359.

Ingram and O'Keeffe contend, however, that Hartunian's failure to seek such intervention leaves the record barren as to the merits of his petition. Of course, had Hartunian been denied leave to intervene, we would be considering exactly the same issue on this appeal, for in that case, as in this one, the adequacy of the representation afforded the taxpayers and the validity of the agreement would have been the points in dispute. Ill. Rev. Stat. 1977, ch. 110, par. 26.1(1)(b).

Hartunian's motive in entering this suit is irrelevant. (*Turkovich v. Board of Trustees* (1957), 11 Ill. 2d 460, 464; 74 Am. Jur. 2d *Taxpayers' Actions* sec. 32 (1974).) There is no conflict of interest, as contended, for his actions can only benefit the MSD. No one else has indicated an intention to appeal on its behalf and in behalf of the inadequately represented taxpayers.

In a related argument, it is said that Hartunian's failure to seek intervention at trial has resulted in an undeveloped record with respect to arguments about the hours O'Keeffe's counsel charged on particular days. Ingram concludes that Hartunian's brief represents undocumented charges of an appellate brief writer. In the sense just related, this is true. But that conclusion is equally applicable to other briefs filed in this court by parties fully represented in the trial court. We can deal with this problem here in the same way we always have dealt with it: by refusing to consider arguments on appeal to which evidence could have been presented in the trial court had the issues been raised there. *Hux v. Raben* (1967), 38 Ill. 2d 223.

The appellate court held, however, that Hartunian, as a nonparty, lacked standing to appeal because he was only "indirectly aggrieved in some indefinite manner in

common with taxpayers generally." (85 Ill. App. 3d 859, 866.) This holding, resting upon the nature of the taxpayers' interest in the controversy, contravenes our holding in *Paepcke v. Public Building Com.* (1970), 46 Ill. 2d 330, adopting, on the standing issue, the dissent filed in *Droste v. Kerner* (1966), 34 Ill. 2d 495. In that dissent it was stated that a taxpayer's interest in the litigation was grounded "upon his status as a taxpayer, and it is his equitable interest, as a taxpayer, in the public property which is being illegally disposed of that determines his standing to maintain the action." (34 Ill. 2d 495, 511 (Schaefer, J., dissenting).) In this case, the taxpayers have an equitable interest in the monetary recovery from Ingram, which was diminished by the award of attorney fees to counsel.

Our decision in *White Brass Castings Co. v. Union Metal Manufacturing Co.* (1907), 232 Ill. 165, and the appellate court's decision in *Chicago & South Side Rapid Transit R.R. Co. v. Northern Trust Co.* (1900), 90 Ill. App. 460, *aff'd on other grounds* (1902), 195 Ill. 288, are also urged as reasons for denying Hartunian derivative appellate standing. These cases, involving the denial of such standing to corporate shareholders, rest upon the failure of the shareholders to establish that their corporation's decision to forgo an appeal was wrongful. The dual nature of the derivative action was previously referred to. In shareholder derivative actions there must be a wrongful refusal of the shareholder's demand to take action. (Compare *Dodge v. Woolsey* (1855), 59 U.S. (18 How.) 331, 15 L. Ed. 401, and *Hill v. Wallace* (1922), 259 U.S. 44, 66 L. Ed. 822, 42 S. Ct. 453, with *Hawes v. Oakland* (1882), 104 U.S. 450, 26 L. Ed. 827, and *In re Cutting* (1877), 94 U.S. 14, 24 L. Ed. 49. See the opinion of the court and the concurring opinion in *Ashwander v. Tennessee Valley Authority* (1936), 297 U.S. 288, 80 L. Ed. 688, 56 S. Ct. 466.) (Compare *Maldonado v. Flynn* (Del. Ch. 1980), 413

A.2d 1251 (the shareholder was not precluded from suing corporate directors for breach of fiduciary duty despite an independent, "disinterested" committee of directors' business judgment that such a suit was not in the best interests of the corporation) with *Maldonado v. Flynn* (S.D.N.Y. 1980), 485 F. Supp. 274 (applying Delaware law, reaching an opposite conclusion).) As this is written, both *Maldonado* cases are now on appeal. (*Maldonado v. Flynn* (Del. Ch. 1980), 417 A.2d 378 (*res judicata* issue); see also *Burks v. Lasker* (1979), 441 U.S. 471, 60 L. Ed. 2d 404, 99 S. Ct. 1831.) Thus the decisions cited by Ingram and O'Keeffe are inapposite because the record fully establishes here that neither the MSD nor O'Keeffe was adequately taking into account the interests of the taxpayers on the attorney fees issue. (See *Henry v. Jeanes* (1890), 47 Ohio St. 116, 24 N.E. 1077 (*Per curiam*).) Accordingly, we do not have to reach the question whether, due to the imperfections in the derivative shareholder/derivative taxpayer analogy (see Comment, *Taxpayers' Suits: A Survey and Summary*, 69 Yale L.J. 895, 903 (1960)), taxpayers must establish a wrongful refusal to appeal because the refusal here was presumptively wrongful.

It has been argued that nonparties should be granted appellate standing in those few cases in which the public interest is adversely affected. Judicial review would thereby be permitted in situations where it is needed. Significantly, it has been contended that allowing such appeals would help prevent "public interest strike suit[s]." It has been urged that such appeals be granted even in the absence of trial court intervention, because intervention may have been neglected because it was thought that the public interest was already protected. Rotunda, *The Public Interest Appellant: Limitations on the Right of Competent Parties to Settle Litigation Out of Court,* 66 Nw. U.L. Rev. 199 (1971).

Research reveals that this court has on several occasions, where equitable, granted derivative appellate standing to non-trial-court parties. In *Iago v. Iago* (1897), 168 Ill. 339, the wife of an insane husband instituted an action for divorce and the trial court appointed a guardian *ad litem* for defendant. A judgment in favor of the wife was rendered, and the guardian *ad litem* took no further action. A writ of error was sued out by the husband's next friend, a nonparty in the trial court. This court stated:

"The power possessed by courts of equity to provide that such defense shall be made is not exhausted by the appointment of a conservator *ad litem* or next friend to defend in the trial court, but may be exercised in courts of review, and further defense of the action for divorce prosecuted by any remedy provided by law whereby reversal of a decree of the trial court may be obtained. ***.
***

It is not essential the same person who represented the insane party as guardian *ad litem* in the circuit court should appear as next friend in a writ of error." 168 Ill. 339, 342-43.

In *In re Estate of Tomlinson* (1976), 65 Ill. 2d 382, a will was admitted to probate in the circuit court of Peoria County. The appellate court reversed the circuit court, finding no evidence that the decedent intended to grant the remainder of her estate to the American Cancer Society. The Attorney General had received no notice of the proceedings and was not a party in the trial or appellate courts. This court permitted him to appeal nevertheless:

"He has the authority to protect a charitable trust either defensively, where an attack is made on its validity, or by an action as plaintiff, by securing the construction of the trust instrument. In a suit by others where the validity or the enforcement of

a charitable trust may come into question the Attorney General should be made a party defendant. [Citations.]

\*\*\* If an outright gift of property to a charitable corporation without restrictions on its use or disposition is involved, the corporation is under a duty to apply the property to one or more of the charitable purposes for which it was organized. This duty is ordinarily enforceable by the Attorney General. [Citations.] The Charitable Trust Act (Ill. Rev. Stat. 1973, ch. 14, par. 51 *et seq.*) vests in the Attorney General authority to enforce and supervise charitable trusts. For these reasons we hold that the Attorney General is a proper party to this appeal." (65 Ill. 2d 382, 387-88.)

See also *People ex rel. Pollastrini v. Whealan* (1933), 353 Ill. 500; *Layfer v. Tucker* (1979), 71 Ill. App. 3d 333, 337.

In *Tomlinson* it was demonstrated that the Attorney General, the guardian of the public interest, had an array of powers normally exercisable in trial court. He should have been, but was not, made a party defendant, yet this court did not confine his ability to represent the public interest to actions available in courts of original jurisdiction. The interest in judicial economy supports that decision.

Here the taxpayers must guard their own equitable interest in the disposition of the monetary recovery from Ingram, and as private attorneys general are permitted to intervene where their interests require additional representation (*Dowsett v. City of Moline* (1956), 8 Ill. 2d 560, 566). Here, as in *Tomlinson,* those able to protect the public interest received no effective notice of the proceeding. The judicial-economy interest, present in *Tomlinson,* also supports resolving the attorney fee issue on appeal in the instant case. And, as we have noted, the inadequate taxpayer representation, a fact not required in *Iago,* supports

granting Hartunian derivative appellate standing. Accordingly, this case is within the narrow holding of the Indiana Supreme Court that taxpayers may "sometimes take up and carry forward a pending litigation which the officers wrongfully abandon \*\*\*." (*Pipe Creek School Township v. Wagler* (1924), 194 Ind. 496, 498, 143 N.E. 514.) Hartunian, therefore, has derivative appellate standing.

We turn then to the remaining issue—whether the attorney fees were excessive. The settlement petition included a schedule of services for A. Denison Weaver, O'Keeffe's counsel, and listed expenses. On April 17, 1979, Weaver introduced in evidence his original diary entries for the years 1975 to 1977. Witnesses for Weaver testified that an hourly rate of $125 was justified due to the nature of the case. Attorney Torshen, for the MSD, called witnesses who testified that rates customarily charged to the public bodies like the MSD approximated $75 per hour. (The MSD paid Hartunian $100 per hour and Torshen $85 per hour; a lesser rate was charged for work of their associates.) The witnesses recognized that a higher rate was charged by privately retained attorneys in cases like this one.

The court ordered the hearing continued for one day to allow the MSD time to examine Weaver's time records. The next day, in a morning session, the court and counsel reviewed purported discrepancies pointed out by the MSD. The MSD had not been able to review all of the records, but did not object to the trial court rendering its decision in the afternoon.

In the afternoon session, the court found that the issues involved "substantial questions of law and fact with numerous complex legal issues," that the attorney fees "were entirely contingent on success until the case was settled," that "the litigation by the taxpayer was vigorously contested by the Ingram Group and [the MSD],"

that the MSD "benefitted substantially by the suit," and that "Mr. Weaver and Mr. Cullen [O'Keeffe's cocounsel] were very well qualified to prosecute this litigation and did so in an outstanding manner." The trial court, however, disallowed 42½ hours from Weaver's petition and 31 hours from Cullen's petition. (Cullen's petition had been submitted on April 17.) Weaver had earlier agreed to strike another 40 hours from his petition, as it was time spent collecting his time records. Nor was 250 hours of law clerk time included. The trial court had spot-checked the records for accuracy. It was found, therefore, that Weaver had spent 3,600 hours and that Cullen had spent 300 hours on this litigation. The court compared these hours to the 1,262 hours spent on the case for the MSD by Hartunian and his associates and 3,056 hours of time spent by Torshen, his associates, and his law clerks on this litigation. The total billings of Hartunian and Torshen, amounting to $273,413.75, were also used as a benchmark. The court expressed its belief that Ingram Corporation attorneys had spent more than 3,600 hours on this litigation, although no documentation was available, and noted that "I have personal knowledge of the hours that were spent before me because I have spent at least 100 days of my court time and office time on this case in the last year and a half."

In setting an hourly rate, the court explicitly found that since Weaver and Cullen were not retained by the MSD, they should be paid at the "going rate" for counsel privately retained for complex civil litigation. The court found $125 per hour for Weaver and $100 per hour for Cullen reasonable under that standard.

The court held that the principles enunciated in *Fiorito v. Jones* (1978), 72 Ill. 2d 73, applied and, therefore, multiplied this hourly rate by two. The court reasoned that the case was very contingent, asserting that section 11.18 of the Purchasing Act (Ill. Rev. Stat. 1971, ch.

42, par. 331.18), if interpreted literally to result in total forfeiture, was of doubtful constitutionality. The court noted that a multiplier of three undoubtedly would have been applied if the case had been tried.

We agree with the trial court that the principles of *Fiorito v. Jones* (1978), 72 Ill. 2d 73, *Leader v. Cullerton* (1976), 62 Ill. 2d 483, and *Flynn v. Kucharski* (1974), 59 Ill. 2d 61, apply here. (*Alyeska Pipeline Service Co. v. Wilderness Society* (1975), 421 U.S. 240, 257, 44 L. Ed. 2d 141, 153, 95 S. Ct. 1612, 1621; *Sprague v. Ticonic National Bank* (1939), 307 U.S. 161, 83 L. Ed. 1184, 59 S. Ct. 777; *Trustees of International Improvement Fund v. Greenough* (1882), 105 U.S. 527, 26 L. Ed. 1157.) On this record we cannot say that the trial court erred in its determination that Weaver spent 3,600 hours and that Cullen spent 300 hours on this litigation. (We cannot validly rule on several challenges to the hours charged on particular days because evidence could have been produced in the trial court on these issues.) We do not reach the issue of whether Weaver and Cullen should be compensated at a rate comparable to other privately retained attorneys because they were hired by O'Keeffe, because that issue was not argued here. We note, however, the conceptual difficulty in allowing that rate in a *derivative* action, in which the client is a public entity and customarily pays less than the going rate for privately retained counsel.

We disagree with the trial court, however, regarding the multiplier of two. This litigation was complex and bitterly contested, and the fee was contingent to be sure. However, the Federal prosecution provided the facts necessary to establish the violation (*Fiorito v. Jones* (1978), 72 Ill. 2d 73, 91). No case has been presented, moreover, which would demonstrate that an action under section 11.18 of the Purchasing Act (Ill. Rev. Stat. 1971, ch. 42, par.

331.18) would result in an insubstantial recovery. It is also significant that the MSD filed its motion for summary judgment in Federal court prior to the time O'Keeffe filed his motion in the circuit court. The filing of that motion certainly aided O'Keeffe.

The problem of excessive attorney fees is at least a century old. (See *Trustees of International Improvement Fund v. Greenough* (1882), 105 U.S. 527, 26 L. Ed. 1157.) We have now allowed for the first time derivative appellate standing to a taxpayer to challenge an attorney fees award. This holding is new but not unforeshadowed by prior cases. Taxpayer suits significantly supplement the public's remedial arsenal for combatting official wrongdoing, and we will not permit excessive fee awards to undermine their value.

Accordingly, we reverse the judgments of the circuit and appellate courts, eliminate the multiplier, and remand the cause to the circuit court of Cook County for entry of the appropriate fee award, amounting to $450,000 for Weaver, and $30,000 for Cullen, plus costs, and to dismiss Ingram from the cause.

*Reversed and remanded,*
*with directions.*

MR. JUSTICE SIMON took no part in the consideration or decision of this case.