THE CITY OF CHICAGO *ex rel.* DEMETRI KONSTANTELOS *et al.,* Plaintiffs-Appellants, *v.* DUNCAN TRAFFIC EQUIPMENT COMPANY *et al.,* Defendants-Appellees.—(THE CITY OF CHICAGO, Plaintiff-Appellee, *v.* DUNCAN TRAFFIC EQUIPMENT COMPANY *et al.,* Defendants-Appellees.)

First District (3rd Division)    No. 79-1762

Opinion filed November 18, 1981.—Rehearing denied December 29, 1981.

George C. Pontikes, of Foss, Schuman & Drake, of Chicago, for appellants.

Stanley Garber, Corporation Counsel, of Chicago (Robert R. Retke and Cheryl L. Smalling, Assistant Corporation Counsel, of counsel), for appellee City of Chicago.

James N. Karahalios, of Chicago, for appellee John Geocaris.

Sidney J. Hess, Jr., Joel J. Sprayregen, Roger L. Price, and Gary E. Mitchell, all of Aaron, Schimberg, Hess, Rusnak, Deutsch & Gilbert, of Chicago, for appellees Duncan Traffic Equipment Company, Jerome J. Robinson, and Ted Mieczynski.

PRESIDING JUSTICE RIZZI delivered the opinion of the court:

Plaintiff, *Demetri Konstantelos (hereinafter Taxpayer)*, filed a taxpayer's suit in the name and for the benefit of the city of Chicago to recover money belonging to the city which was allegedly paid without authority of law. (Ill. Rev. Stat. 1979, ch. 24, par. 1—5—1.) After the Taxpayer's suit was filed, the city filed its own suit involving the same subject matter against some of the same defendants named in the Taxpayer's suit. The two cases were consolidated. The Taxpayer's suit was later dismissed pursuant to a motion by defendants. Shortly thereafter, the city's suit was dismissed pursuant to a settlement agreement between the city and the defendants named in the city's suit. Neither the Taxpayer nor his attorney was given any details of the settlement. The Taxpayer appeals the dismissal of the Taxpayer's suit and the dismissal of the city's suit. We reverse the dismissals and remand.

The Taxpayer's suit named as defendants Duncan Parking Meter Maintenance Company; Jerome J. Robinson, president of Duncan Parking Meter Maintenance Company; Ted Mieczynski, vice-president of Duncan Parking Meter Maintenance Company; John Geocaris, deputy commissioner of streets and sanitation in charge of parking; and the treasurer of the city of Chicago.[1] The complaint charged that Duncan Parking had a contract to inspect the parking meters for the city and that it submitted a bill to the city for the inspection of 34,974 parking meters during the months of January and February 1979. The bill totaled $270,681. The complaint further alleged that the deputy commissioner signed city reports stating that the inspections were made by Duncan Parking twice a week during January and February. In addition, the

---

[1] The treasurer of the city of Chicago was named as a nominal defendant only. Neither the complaint nor the amended complaint makes any allegation of wrongdoing against the treasurer of the city of Chicago.

complaint alleged that the deputy commissioner approved payment of the bill of $270,681, which was then paid by the treasurer. The complaint goes on to charge that there was a conspiracy by Robinson, Mieczynski and the deputy commissioner whereby the deputy commissioner was to pay all bills submitted by Duncan Parking whether or not Duncan Parking in fact performed services for the city. Also, the complaint charged that as a result of near-blizzard snow conditions during most of January and February 1979, it was impossible to have made the inspections which Duncan Parking claims were made, and that no actual services were rendered to the city in exchange for the payment of $270,681. The complaint also states that in light of the fact that weather conditions did not permit an inspection of the parking meters by Duncan Parking, the deputy commissioner's approval of the payment of the bill for $270,681 cannot be explained by mere administrative oversight and negligence. In addition to other relief, the complaint requested that Duncan Parking and the deputy commissioner provide a full and complete accounting of services rendered by Duncan Parking during the months of January and February 1979.

On April 23, 1979, Duncan Parking filed a verified answer in which it denied the allegations in the complaint as they pertained to it, and a motion to dismiss in which it denied that it had a contract with the city to inspect parking meters. On April 26, an order was entered giving the Taxpayer until May 17 to respond to Duncan Parking's motion to dismiss, and to ascertain the true identity of the corporation that actually entered into the contract with the city.

Starting that same day, April 26, the Taxpayer sought to obtain from the corportion counsel the true identity of the corporation and a copy of the contract for the inspection of parking meters. The Taxpayer had a conversation with an assistant corporation counsel in which he asked whether the corporation counsel would divulge the name of the corporation without the necessity of a subpoena. The Taxpayer was promised that the matter would be looked into and that the Taxpayer would be advised further. Thereafter, the Taxpayer called the corporation counsel's office on at least two occasions to ascertain the true name of the corporation and to obtain a copy of the contract. On each occasion, the Taxpayer was told that the matter would be looked into and that he would be further advised. Subsequently, the Taxpayer called the assistant corporation counsel a third time and was told that he should write a letter to the purchasing agent of the city requesting the name of the corporation and a copy of the contract. Such a letter was delivered by messenger on May 2. The letter states in part:

> "RE: City of Chicago, ex rel. Demetri Konstantelos v. Duncan Parking Meter Maintenance Co., Inc., et al - 79 CH 2238

It is my understanding that you have a copy or copies of the contract regarding the inspection of parking meters by one of the corporations controlled by Jerome Robinson and Ted Mieczynski.

I represent the Plaintiff in the above cause, Demetri Konstantelos. He has brought a taxpayer's action seeking an accounting for the $270,681.00 paid by the City to the corporation that has the contract. In the suit, we named Duncan Parking Meter Maintenance, Inc. In response to the suit, it has filed an answer and a motion to dismiss. It has denied that it is a party to this contract. On April 26, 1979, Judge Cohen gave the Plaintiff 21 days within which to respond to the motion and ascertain the identity of the corporation that has signed the contract.

For that purpose, I am, by this letter requesting that you furnish me with a copy of that contract.

I would appreciate knowing whether you will voluntarily furnish me with such a copy by May 7, 1979. Otherwise I shall have to issue a subpoena.

A copy of this letter is being sent to Mr. Konstantelos and to * * * the Corporation Counsel's Office."

After the May 7 deadline, the Taxpayer again called the assistant corporation counsel and was told that he would be advised further regarding the matter. Having received no response, on May 10, the Taxpayer served a deposition subpoena for May 14 on the purchasing agent. However, on May 14, a contract was delivered to the attorney for the Taxpayer with a letter from the corporation counsel. The letter states in part:

"RE:   Request for Contract relative to Cause No. 79 CH 2238, City of Chicago, ex rel. Konstantelos v. Duncan Parking Meter Maintenance Company, et al.

In response to your letter dated May 2, 1979, directed to [the] Purchasing Agent of the City of Chicago, requesting a copy of the contract regarding the inspection of parking meters, we are enclosing herewith a copy of said contract."

However, a review of "said contract" revealed that the contract furnished with the letter was not the correct contract, and it did not name the corporation that had the contract for the inspection of the city's parking meters.

Finally, on May 17, the last day the Taxpayer had to file a response to Duncan Parking's motion to dismiss, the assistant corporation counsel supplied the Taxpayer's attorney with the name of the corporation that had the contract for the inspection of the city's parking meters, *i.e.*,

Duncan Traffic Equipment Company. Thereupon, the Taxpayer set up a motion for May 24 to dismiss Duncan Parking as a defendant, and for leave to file an amended complaint naming Duncan Traffic Equipment Company as a defendant. On that same day, although the city was a party-plaintiff in the Taxpayer's suit and as such was represented by the corporation counsel, the corporation counsel filed a motion as attorney for defendant Geocaris to extend the time for that defendant to answer the amended complaint.[2]

At that time, the Taxpayer's attorney again requested the corporation counsel to send him a copy of the contract involving Duncan Traffic Equipment Company's agreement to inspect the city's parking meters. The assistant corporation counsel stated that the contract would be furnished. The city did not send the Taxpayer's attorney the contract, but the corporation counsel filed a separate suit against Duncan Traffic and Robinson. Geocaris is not named as a defendant. The city's suit states that Duncan Traffic had a contract with the city whereby Duncan Traffic was to inspect, repair and maintain the city's parking meters. The complaint also states that the contract required Duncan Traffic to make approximately 360,000 inspections of parking meters per month and that the city was to pay Duncan Traffic a unit price per meter per rate of inspection. Although a copy of the contract was not attached to or made a part of the complaint, the complaint states:

"The contract further provides that:
Inspection shall mean the maintenance man on foot shall scrutinize the parking meter examining all external parts for cleanliness, looseness or damage turning handle to test the operative condition of the meter and checking the pedestal for plumb and tightness.

The Contractor shall establish and maintain a system for recording inspection, maintenance and repair service performed on a district and individual meter basis. The Contractor shall furnish daily to the Commissioner of Streets and Sanitation a report showing the districts in which the inspections were made * * *. Inspection, repair and maintenance records and material and parts record of the contractor, pertaining to this contract, shall be available for inspection, upon request, by the Commissioner of Streets and Sanitation."

The city's complaint also states that records furnished to the city by the First National Bank of Chicago indicate that at least 636 parking meters were not collected during the months of January and February

---

[2] Subsequently, a private attorney appeared on behalf of defendant Geocaris.

1979,[3] but that the records submitted to the city by Duncan Traffic indicate that full service was rendered by Duncan Traffic on those same parking meters during January and February 1979, and that the city paid Duncan Traffic for such alleged service.[4] The city's complaint charges that the services for these 636 parking meters, although paid for by the city, were not performed. The complaint also charges that the inspections and repairs of the city's parking meters reported by Duncan Traffic for the months of January and February 1979 were not performed by Duncan Traffic, and that the payments made by the city pursuant to the invoices submitted by Duncan Traffic for the months of January and February 1979 included substantial payments for work never performed.

Duncan Traffic and Robinson filed an answer to the city's complaint which states in part:

> "Defendants further state that the extent of Duncan's contractual obligations to inspect and maintain parking meters is established by the contract and the historic practice of the parties."

Subsequently, the Taxpayer's suit and the city's suit were consolidated for trial. The Taxpayer filed a motion to disqualify the corporation counsel from representing the city as a party-plaintiff because the corporation counsel filed a motion representing defendant Geocaris, and an assistant corporation counsel appeared in court on behalf of defendant Geocaris and moved for an extension of time for said defendant to answer the Taxpayer's amended complaint. The Taxpayer's position was that the corporation counsel was representing conflicting interests. The motion was continued, and when the trial court later dismissed the Taxpayer's suit, the trial court stated that the Taxpayer's motion to disqualify the corporation counsel was moot.

In addition, defendants Duncan Traffic, Robinson and Mieczynski filed a motion to dismiss the Taxpayer's suit because the Taxpayer failed "prior to instituting this action, to demand of the proper public officials that the city itself file an action against defendants." (See *People ex rel. Chicago v. Schreiber* (1944), 322 Ill. App. 452, 483, 54 N.E.2d 862, 875; *People ex rel. Lee v. Kenroy, Inc.* (1977), 54 Ill. App. 3d 688, 691, 370 N.E.2d 78, 81.) The Taxpayer opposed the motion, contending that the statute under which the suit was brought (Ill. Rev. Stat. 1979, ch. 24, par.

---

[3] The First National Bank of Chicago apparently counts the collections given to it and turns the money over to the city along with its records for the money collected.

[4] In its answer, Duncan Traffic affirmatively states that collection from the meters is not the contractual obligation of Duncan Traffic. However, the record suggests from statements made by the trial court that there is a separate contract for the meter collections between the city and either Duncan Parking or another company "apparently wholly owned either by the defendant-corporation here or by its principal bearing a similar, but different name ° ° °."

1—5—1) does not provide that a prior demand upon the municipality is necessary,[5] and in any event, "a demand need not be made where it would be a useless act." The Taxpayer also contended that "the chronology of events in the instant case amply demonstrates that a demand would be futile." The city did not join in the motion to dismiss and it did not file a motion to dismiss the Taxpayer's suit.

On September 27, 1979, the trial court granted the motion to dismiss the Taxpayer's suit solely for the reason that "the taxpayer-plaintiffs did not at any time, prior to the filing of the City's Complaint for accounting and other relief on May 30, 1979, demand that the City bring suit against Duncan." Further, the trial court stated:

> "The city has filed the Complaint for accounting and other relief as stated before, on May 30, 1979, and the defendants have responded to that Complaint with an Answer. The Answer was filed June fifth, 1979. It appears to meet what is the rather narrow thrust of the [City's] Complaint.
>
> The [city's] Complaint alleges in Paragraph Six: Records furnished to the City of Chicago by the First National Bank of Chicago indicate that at least 636 meters located in the meter facilities maintained by the City of Chicago were not collected from during the months of January and February, 1979, despite the fact that meters are to be collected at least once each month. The answer to that is somewhat oblique with respect to whether or not there were 636 meters or more or less that were not serviced during those months, but the Answer does point out—and properly so—that the matter of collection for the meters is not the subject of this lawsuit, that is the subject the Court has been given to understand, by arguments of counsel, of a separate contract with a company apparently wholly owned either by the defendant-corporation here or by its principal bearing a similar, but different name * * *.
>
> [S]ince the issues appear to be rather definitely narrowed, at least based upon the pleadings before me, to alleged failure to inspect at least 636 meters, I am ordering Counsel for the city and for the

---

[5] The Taxpayer takes the position that since the statute under which the suit was filed does not state that a demand must be made upon the municipality prior to filing suit, no prior demand is necessary. The Taxpayer attempts to distinguish *People ex rel. Chicago v. Schreiber* (1944), 322 Ill. App. 452, 483, 54 N.E.2d 862, 875, and *People ex rel. Lee v. Kenroy, Inc.* (1977), 54 Ill. App. 3d 688, 691, 370 N.E.2d 78, 81, which hold that a taxpayer must make a prior demand upon the municipality, on the basis that those cases are common law actions and do not involve actions brought pursuant to a statute that does not state that a prior demand must be made. Also, since the statute itself is silent as to the necessity of a prior demand, questions arose during oral argument as to the person or persons upon whom the demand must be made, what the demand must include, how long before suit is filed the demand must be made and whether the demand must be in writing.

defendants to meet with the Court in pre-trial conference on Wednesday, October third.

\* \* \*

[Attorney for Duncan Traffic]: May I respectfully question the presence of counsel for the taxpayer-plaintiffs \* \* \* inasmuch as their complaint has been dismissed? Why are they proper participants in the pre-trial conference?

\* \* \*

[Attorney for Geocaris]: Just for the record, Your Honor, the Court's ruling includes the defendant, Geocaris, in the dismissal.

THE COURT: Of course.

[Attorney for Duncan Traffic]: Then the pre-trial conference Your Honor, then will be between the Corporation Counsel's office and counsel for the defendants, if I understand your latest ruling correctly.

\* \* \*

THE COURT: [T]he Court isn't going to make any commitment at this time. I may invite several people to that conference."

After several pretrial conferences between the city and Duncan Traffic and Robinson, on October 18, 1979, within 21 days after the Taxpayer's suit was dismissed, the city settled its suit for a total payment of $5,000 by Duncan Traffic and Robinson. A stipulation and settlement agreement between the city and Duncan Traffic and Robinson was filed which provides that the $5,000 settlement "constitutes a resolution of all issues of dispute between and among the parties which were the subject of this cause of action." Neither the Taxpayer nor his attorney attended any of the pretrial conferences, and they were not given any details of the settlement.

Defendants first contend that the Taxpayer's suit was properly dismissed because the Taxpayer did not make a demand upon the city to bring suit against defendants prior to filing suit. In addressing this issue, we must recognize that the Taxpayer's complaint makes grave allegations and charges which, if true, demand that the taxpayers' interests be satisfactorily pursued and protected to fulfill the purpose of the statute under which the suit is brought. (See *Metropolitan Sanitary District ex rel. O'Keeffe v. Ingram Corp.* (1981), 85 Ill. 2d 458, 426 N.E.2d 860.) The fact that at least some of these allegations and charges are not frivolous is demonstrated by the fact that the city filed its own suit, making generally the same allegations and charges as the Taxpayer. The city alleges and charges that:

1. The "agreement between the city of Chicago and Duncan Traffic Equipment Company requires Defendants to make approximately 360,000 inspections of parking meters per month" and that

the "City of Chicago pays Defendants a unit price per meter per rate of inspection."

2. The records "furnished to the city of Chicago by the First National Bank of Chicago indicate that at least 636 meters * * * were not collected during the months of January and February, 1979, despite the fact that meters are to be collected at least once each month."

3. The "repair and maintenance records submitted to the city of Chicago by defendants for the same metered facilities for the months of January and February, 1979, indicate that full service was rendered by defendants for these meters" and that the city "was invoiced and paid for repair and maintenance of said metered facilities which defendants reported it performed during this two-month period."

4. The "City of Chicago paid defendants for the inspection and maintenance of at least 636 meters from which collections, although required, were not made."

5. The "inspection and repairs of the meters in the metered facilities reported by the defendants for the months of January and February, 1979, were not performed by defendants."

6. The "payments made pursuant to the invoices submitted to the City of Chicago by the Defendants for the months of January and February, 1979, included substantial payments for work never performed."

The Taxpayer's complaint makes generally these same charges, and moreover, alleges that the city was aware that the payments made pursuant to the invoices included substantial payments for work never performed. Thus, assuming the facts alleged by the Taxpayer and the city are true, although the city had knowledge of the facts, it took no action against Duncan Traffic until after the Taxpayer's suit was filed.

Also, the Taxpayer's suit names the deputy commissioner of the Department of Streets and Sanitation as a defendant and alleges that he was in charge of approving invoices and authorizing payments for work performed by Duncan Traffic under the terms of the contract with the city, that he approved and authorized the payment of invoices for work never performed by Duncan Traffic, that he knew that the work was not and could not have been performed, that the invoices submitted were false and contained material misrepresentations, and that the approval and payment thereof was illegal and constituted a fraud upon the taxpayers of the city of Chicago. Notwithstanding these allegations and charges in the Taxpayer's suit, the city's suit omits naming the deputy commissioner of the Department of Streets and Sanitation as a defendant.

In addition, the Taxpayer's suit was filed on April 12, 1979. The city's

suit was filed on May 31, 1979. The city filed a seven paragraph request for production of documents. No objections were filed by defendants, but there is nothing in the record to suggest that defendants ever complied with the request, and no documents were ever submitted to the plaintiff Taxpayer although the suits were consolidated. The Taxpayer also filed a request for production of documents. Defendants filed written objections to the Taxpayer's request, and the suit was dismissed without the production of any documents by defendants. No depositions were taken, and there was no other discovery.

The Taxpayer's suit was dismissed on September 27, 1979, slightly more than 5 months after the complaint was filed. Within 21 days thereafter, the city's suit was on trial and was settled for $5,000 between the city and Duncan Traffic and Robinson, without any discovery except as otherwise stated herein. It is hard to reconcile the swift disposition of this entire matter for the sum of $5,000 without depositions or any meaningful discovery when the Taxpayer charges that the defendants were paid $270,681 by the city for work they never performed, and the city's own complaint charges "that the payments made pursuant to the invoices submitted to the City of Chicago by the defendants for the months of January and February, 1979, *included substantial payments for work never performed.*" (Emphasis added.)

Under the circumstances, on the issue of whether the Taxpayer's suit should have been dismissed because the Taxpayer did not make a demand upon the city to sue defendants prior to filing suit, we believe that what the court stated and held in *Metropolitan Sanitary District ex rel. O'Keeffe v. Ingram Corp.* (1981), 85 Ill. 2d 458, 426 N.E.2d 860, is applicable here. In that case, a taxpayer's suit was brought by the taxpayer, O'Keeffe, on behalf of the MSD against Ingram and other related defendants. The suit was settled. As part of the settlement, the MSD agreed not to appeal the fee award provided in the settlement. Hartunian, a taxpayer, appealed the fee award on behalf of the MSD. O'Keeffe had not given the MSD notice or demand prior to filing suit on behalf of the MSD as a taxpayer, and Hartunian contended that therefore O'Keeffe did not have standing to sue the MSD. The court stated and held:

> "The crux of Hartunian's argument, however, is that O'Keeffe neither asked the MSD to sue Ingram nor demonstrated that such a request would have been futile. * * *
> * * * When the MSD finally filed a motion to intervene and dismiss O'Keeffe, the trial court appropriately held a hearing (*cf. DePinto v. Provident Security Life Insurance Co.* (9th Cir. 1963), 323 F.2d 826, *cert. denied* (1964), 376 U.S. 950, 11 L. Ed. 2d 969, 84 S. Ct. 965) and appropriately decided on the basis of the whole

record not to eliminate the taxpayer from the suit. *Green v. Jones* (1924), 164 Ark. 118, 124, 261 S.W. 43, 45. *Cf. Palmer v. Morris* (5th Cir. 1965), 341 F.2d 577 *(per curiam)*.

\* \* \*

\* \* \* We therefore defer to the trial court's determination that keeping O'Keeffe in the case helped assure that the public interest in the case was fully represented. \* \* \*

A necessary predicate to the trial court's conclusion, which we have now approved, that O'Keeffe had standing was that there were grounds to believe that the MSD was inadequately protecting the public interest." 85 Ill. 2d 458, 468-70, 426 N.E.2d 860.

■■ In the present case, the public interest was likewise entitled to be fully represented. On the basis of the whole record as demonstrated by the facts previously stated, there were grounds to believe that the city was inadequately protecting the public interest in the matter. Therefore, the Taxpayer should have remained in the case, and his suit should not have been dismissed, even though the Taxpayer, like the taxpayer in *O'Keeffe*, had not made a demand to sue defendants prior to filing suit as a taxpayer.

Defendants next contend that the Taxpayer lacks standing to appeal from the $5,000 settlement agreement between the city and defendants because the Taxpayer was not a party to the settlement. This contention overlooks the nature of the Taxpayer's interest in the controversy. The Taxpayer's interest in the litigation is grounded upon his status as a taxpayer, and it is his equitable interest as a taxpayer in the public property which is allegedly being illegally disposed of that determines his standing to maintain the action and the appeal. This is made very clear in the *O'Keeffe* case. In that case, Hartunian, the Taxpayer on appeal, was not a party in the trial court in any capacity and had not even intervened in the trial court. Thus, the Taxpayer's position in the present case is stronger than Hartunian's position in the *O'Keeffe* case. In holding that Hartunian had standing to appeal the settlement between MSD and Ingram, the court stated:

> "The appellate court held, however, that Hartunian, as a non-party, lacked standing to appeal because he was only 'indirectly aggrieved in some indefinite manner in common with taxpayers generally.' (85 Ill. App. 3d 859, 866.) This holding, resting upon the nature of the taxpayers' interest in the controversy, contravenes our holding in *Paepcke v. Public Building Com.* (1970), 46 Ill. 2d 330, adopting, on the standing issue, the dissent filed in *Droste v. Kerner* (1966), 34 Ill. 2d 495. In that dissent it was stated that a taxpayer's interest in the litigation was grounded 'upon his status as a taxpayer, and it is his equitable interest, as a taxpayer, in the

public property which is being illegally disposed of that determines his standing to maintain the action.' (34 Ill. 2d 495, 511 (Schaefer, J., dissenting).) In this case, the taxpayers have an equitable interest in the monetary recovery from Ingram, which was diminished by the award of attorney fees to counsel." 85 Ill. 2d 458, 475-76, 426 N.E.2d 860.

■■ Likewise, in the present case, the taxpayers have an equitable interest in the monetary recovery from Duncan Traffic if the city wrongfully paid Duncan Traffic for work which was never performed in January and February 1979. We therefore conclude that the Taxpayer had standing to appeal the settlement.

Next, defendants contend that the city bound all taxpayers by its settlement agreement with Duncan Traffic and Robinson, and therefore the Taxpayer's appeal is moot. Ordinarily, courts favor settlements, and the parties are bound by their settlement agreements. However, an exception exists for settlement agreements which are contrary to public policy. We conclude that, under the circumstances of this case, public policy dictates that the $5,000 settlement agreement between the city and Duncan Traffic and Robinson should not be enforced or bind the taxpayers. *Cf. O'Keeffe*, 85 Ill. 2d 458, 470-75, 426 N.E.2d 860.

Here, although the Taxpayer charged that as a result of an illegal conspiracy the city paid Duncan Traffic $270,681 for "not inspecting" 34,974 meters, the city in swift fashion, with no depositions or meaningful discovery, settled the matter with Duncan Traffic and Robinson for only $5,000. Significantly, the whole record, including statements by the trial judge, demonstrates that the city only proceeded on the basis that Duncan Traffic was paid for "not inspecting" 636 meters. During oral argument, the attorney for Duncan Traffic admitted that the settlement was based solely on the question of the payment for work never performed in the reported "inspection" of the 636 meters.[6] However, the Taxpayer charges that the city unlawfully paid Duncan Traffic $270,681 for "not inspecting" 34,974 meters. Thus, in the settlement agreement, the taxpayers were not fully and adequately represented as to the cause of action charged in the Taxpayer's suit.

Under the circumstances, the $5,000 settlement agreement between the city and Duncan Traffic and Robinson should not be enforced or bind the taxpayers. On this point, what the court stated and held in *O'Keeffe* is apposite:

---

[6] At oral agrument, the attorney for the corporation counsel's office argued solely on the issue of the standing of the Taxpayer to maintain the action because he did not make a prior demand upon the city to sue the defendants, and he adopted the oral argument of Duncan Traffic on the other issues. However, in the trial court, the city did not file a motion to dismiss the Taxpayer's suit for any reason, and the city did not join in Duncan Traffic's motion to dismiss the Taxpayer's suit.

"Several sources of public policy persuade us that the [settlement] agreement to forgo an appeal should not be enforced here. * * * [T]he taxpayers were not adequately represented at the fee-determination proceeding. * * * [T]his court has a policy of refusing to enforce the terms of settlement agreements which disadvantage unincluded parties.

* * *

Public policy is traditionally found primarily in the Constitution and statutes and only secondarily in case law. Nevertheless, in *Popovich v. Ram Pipe & Supply Co.* (1980), 82 Ill. 2d 203, this court declined to enforce a settlement agreement according to its terms where such enforcement would have violated the longstanding policy against double recoveries. The prohibition against double recovery is one found in our case law. The companion case, *Palmer v. Avco Distributing Corp.* (1980), 82 Ill. 2d 211, noted, in addition, the problem with settlement agreements that prejudice unincluded parties.

Here, the advance agreement not to appeal the attorney fees award was made by parties inadequately representing absent taxpayers. It was intended, nevertheless, for the taxpayers to have been bound by the judgment entered. They had no advance notice of what the settlement entailed or how they could register a protest. * * *

* * *

For the foregoing reasons, we decline to enforce the [settlement] agreement not to appeal." 85 Ill. 2d 458, 471-74, 426 N.E.2d 860.

■■ In the present case, for the reasons previously stated, there are grounds to likewise conclude that the taxpayers were not fully and adequately represented in the settlement agreement. Since courts have a policy of refusing to enforce the terms of settlement agreements which disadvantage unincluded parties, the $5,000 settlement agreement between the city and Duncan Traffic and Robinson should not be enforced or bind the taxpayers.

■■ Defendants also claim that the Taxpayer's suit should be dismissed "for failure to allege that the purportedly illegal expenditures will create an increase in plaintiffs' taxes." We disagree with defendants' contention. The Taxpayer's amended complaint alleges that defendants received $270,681 from the city for work not performed and demands an accounting. Accepting the allegations as true for purposes of the motion to dismiss, the allegations are sufficient to conclude that the recovery of the $270,681 would reduce *pro tanto*, or to some extent, the amount of taxes which the Taxpayer and other taxpayers would otherwise have to pay.

■■ Defendants also contend that the Taxpayer's suit should be dismissed

because the Taxpayer did not allege that the subject invoices were paid in violation of an ordinance or in excess of statutory authority. However, the Taxpayer's amended complaint alleges that the defendants submitted sworn vouchers that were paid by the city for work not performed with full knowledge of the facts. We conclude that if the allegations are true, the city paid the invoices "without authority of law" within the meaning of the statute under which the Taxpayer's suit was brought.[7]

Finally, defendants contend that the Taxpayer and the city should not be jointly litigating the case against defendants. We disagree. In *O'Keeffe*, the court stated in response to a similar contention:

"We therefore defer to the trial court's determination that keeping [the Taxpayer] in the case helped assure that the public interest in the case was fully represented. We also wonder, as did the trial court, what the obstacle was to the MSD and O'Keeffe jointly litigating the case against Ingram, once the MSD decided that it, too, was interested in pursuing Ingram for the alleged Purchasing Act violations." 85 Ill. 2d 458, 470, 426 N.E.2d 860.

■■ Under the circumstances in the present case, we find no obstacle to the Taxpayer and the city jointly litigating the case against defendants. On the contrary, keeping the Taxpayer in the case should help assure that the public interest will be fully represented.

Accordingly, the order dismissing the Taxpayer's suit is reversed. The settlement agreement between the city and Duncan Traffic and Robinson is not enforceable and does not bind the taxpayers of the city of Chicago, and the order dismissing the City's suit pursuant to the settlement agreement is reversed. The case is remanded for further proceedings.

Reversed and remanded.

McNAMARA and McGILLICUDDY, JJ., concur.

---

[7] The statute provides: "A suit may be brought by any taxpayer ° ° ° against any person to recover any money or property belonging to the municipality, or for any money which may have been paid, expended or released without authority of law." Ill. Rev. Stat. 1979, ch. 24, par. 1—5—1.