(No. 73485.— (No. 74181.—

THE PEOPLE *ex rel.* ROBERT SKLODOWSKI *et al.*, Appellants, v. THE STATE OF ILLINOIS *et al.*, Appellees.

*Opinion filed June 16, 1994.—Modified on denial of rehearing November 15, 1994.*

118

FREEMAN, J., joined by HARRISON, J., concurring in part and dissenting in part.

Clinton A. Krislov and Jonathan Nachsin, of Krislov & Associates, Ltd., and Kevin B. Rogers, all of Chicago, for appellants.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, of Chicago, of counsel), for appellee State of Illinois.

Susan Getzendanner, of Skadden, Arps, Slate, Meagher & Flom, of Chicago, for appellee Universities Retirement System.

William J. Campbell, Jr., of Rudnick & Wolfe, of Chicago, for appellee Teachers' Retirement System.

JUSTICE McMORROW delivered the opinion of the court:

These consolidated appeals arise from an act of the legislature that directed the transfer of moneys from certain special funds in the State treasury to the general revenue fund, as part of an effort to balance the State's budget for fiscal year 1992. The named plaintiffs, participants in the five retirement systems funded by the State, seek review of the circuit court's denial of their motion for a temporary restraining order that would have prevented the State comptroller from transferring the money. Plaintiffs also seek to disqualify the Attorney General, on grounds of conflict of interest, from acting as legal representative of three of the retirement systems, which are nominal defendants in this litigation.

We affirm the circuit court's denial of plaintiffs' motion to disqualify the Attorney General in appeal No. 74181. Because the injunctive relief requested in appeal No. 73485 is no longer available, and the constitutional issues raised in the interlocutory appeal remain at issue in the litigation pending before the circuit court, we dismiss appeal No. 73485 for lack of justiciability.[1]

---

[1]The majority opinion and the dissenting opinion refer to the

## BACKGROUND

Plaintiffs are participants in and beneficiaries of the five retirement systems funded by the State of Illinois under the Illinois Pension Code (Ill. Rev. Stat. 1991, ch. 108¹/₂, par. 1—101 *et seq.*): the General Assembly Retirement System; the State Employees' Retirement System of Illinois; the State Universities Retirement System; the Teachers' Retirement System of the State of Illinois; and the Judges Retirement System of Illinois. Defendants are the State of Illinois, the Governor, the Comptroller, the Speaker of the House of Representatives, the President of the Senate, and the Treasurer. Nominal defendants are the trustees of the five retirement systems.

The instant, interlocutory appeal is ancillary to litigation currently pending in the circuit court and cannot be fully understood without reference to that litigation. In 1991 plaintiffs filed a *mandamus* action on behalf of themselves and a putative class consisting of all participants in and beneficiaries of the five retirement systems. Their complaint challenged the State's failure to comply with certain provisions of the Pension Code by "knowingly budgeting, appropriating and paying State contributions of less than the minimum amounts required by P.A. 86—273, and failing to reduce the unfunded pension liability of the [five retirement systems]." According

underlying complaint for *mandamus* and declaratory relief as pending in the circuit court. However, subsequent to the hearing of the instant, interlocutory appeal from denial of temporary injunctive relief, the circuit court dismissed the underlying complaint. The dismissal was not a part of the record in this appeal. Plaintiffs filed notices of appeal from the circuit court's dismissal order with respect to their *mandamus* and declaratory judgment suit. There is now pending in the appellate court a consolidated appeal from the circuit court's dismissal judgment. This change in the procedural status of the underlying litigation is immaterial to our disposition of the issues raised in the instant appeal.

to the complaint, each of the five retirement systems has been "significantly underfunded for many years; that is, each Fund has had assets totalling substantially less than 100% of the present values needed currently, based upon actuarial assumptions, to fund all existing Fund obligations." The legislature sought to remedy this underfunding by passing, in October 1989, legislation that required the State to increase its contributions to each of the five retirement systems by equal increments in each of the following seven years, in certain minimum amounts designed to meet the "normal cost" of the retirement funds (the increased and additional accrued benefits), plus amortize each fund's unfunded liability over 40 years.

Plaintiffs' *mandamus* complaint further alleged that despite the enactment of this remedial funding measure, the Governor in each year following 1989 has budgeted a lesser amount than the minimum contributions required by law and the legislators have similarly appropriated lesser amounts than required by law. According to compliance reports issued for each of the five retirement systems, there existed at the time of the filing of the 1991 *mandamus* complaint a combined deficit in these minimum contribution requirements that exceeded $500 million. Overall, plaintiffs charge, the "aggregate unfunded accrued actuarial liability" of the five retirement systems exceeds $10 billion, according to audit reports for the fiscal year 1991.

*First Emergency Budget Act, Public Act 87—14*

While plaintiffs' *mandamus* action was pending, the Governor and the legislature adopted a budget for fiscal year 1992, which was discovered to be $50 million short of the amount needed to balance the budget as required by the Illinois Constitution of 1970. (Ill. Const. 1970, art. VIII, § 2.) To remedy the shortfall, the legislature enacted the Governor's First Emergency Budget Relief Act (Pub. Act 87—14, eff. July 24, 1991) purporting to

delegate to the Governor the authority to transfer up to $50 million from any of the special funds in the State treasury to the general revenue fund. Acting on this authority, the Governor directed the Comptroller to transfer $42 million from certain special funds to the general revenue fund. Of this amount, $21 million was to be transferred from the State Pensions Fund.

In response to the Governor's directive to the Comptroller, to transfer $21 million from the State Pensions Fund to the general revenue fund, plaintiffs immediately sought entry of a temporary restraining order. Shortly thereafter, plaintiffs amended their *mandamus* complaint to add a count for injunction against the transfer and a count for declaratory relief as to the constitutionality of Public Act 87—14. Plaintiffs' emergency motion for a temporary restraining order (TRO) was granted on August 5, 1991, but later dissolved upon the circuit court's denial of plaintiffs' motion for preliminary injunction. The circuit court stayed dissolution of the TRO, however, to enable plaintiffs to seek relief in the appellate court through a motion for stay pending review of the interlocutory appeal from the denial of the TRO. The appellate court denied the motion, but the circuit court extended its stay to permit plaintiffs to seek review in this court.

In September 1991, this court granted direct appeal (No. 72451) and stayed, pending appeal, the transfer of the $21 million from the State Pensions Fund to the general revenue fund. Plaintiffs' challenge to the transfer purportedly authorized by Public Act 87—14 was twofold: (1) allowing the Governor to determine the source and amount of money to be diverted from the special funds was an unconstitutional delegation of the legislature's power of appropriation; and (2) the diversion of the pension fund money to nonpension purposes, especially in light of the billions of dollars of unfunded

liability, was an impairment of pension benefits prohibited by the State and Federal Constitutions.

*Second Emergency Budget Act, Public Act 87—838*

Before this court rendered a decision in appeal No. 72451, the legislature abandoned Public Act 87—14 and enacted in its stead Public Act 87—838, which was titled the Emergency Budget Act of Fiscal Year 1992 (Pub. Act 87—838, eff. January 24, 1992). This Act directed the transfer of moneys from 39 special funds to the general revenue fund. To implement these transfers, Public Act 87—838 amended provisions of the various statutes that governed the use of the special funds.

The source of the moneys in the State Pensions Fund is unclaimed property that escheats to the State by law. Pursuant to a provision of the State Finance Act:

> "The moneys in the State Pensions Fund shall be used exclusively for the administration of the 'Uniform Disposition of Unclaimed Property Act', *** and for the reduction of the accrued actuarial reserve deficiency in each of the annuity and benefit funds established under the [five retirement systems in issue in the instant case].
> ***
> *** [T]he moneys so appropriated from the State Pensions Fund shall be applied exclusively for the reduction of the accrued actuarial reserve deficiencies occasioned by the inadequacies of the appropriations heretofore made to such funds." Ill. Rev. Stat. 1991, ch. 127, par. 144.12.

To permit the transfer of the $21 million from the State Pensions Fund, Public Act 87—838 amended the above statute by adding the following paragraph:

> "In addition to any other permitted use of moneys in the [State Pensions] Fund, and notwithstanding any restriction on the use of the Fund, moneys in the State Pensions Fund may be transferred to the General Revenue Fund as authorized by this amendatory Act of 1992. The General Assembly finds that an excess of moneys exists in the Fund. On February 1, 1992, the Comptroller

shall order transferred and the Treasurer shall transfer $21,000,000 *** from the Fund to the General Revenue Fund." Pub. Act 87—838, § 270, eff. January 24, 1992.

Following the legislature's enactment of Public Act 87—838, defendants filed a motion in this court to dismiss the interlocutory appeal in No. 72451 on the ground that plaintiffs' challenge to the transfer authorized by Public Act 87—14 had been mooted by the legislature's abandonment of that act. In April 1992, this court granted defendants' motion to dismiss and vacated its previous order that had stayed the circuit court's dissolution of the TRO pending appeal. At that time, the new act was not in issue before this court.

Subsequently, plaintiffs returned to the circuit court to seek a TRO against the transfer of the Pension Fund moneys pursuant to the newly enacted Public Act 87—838. Plaintiffs' motion for TRO against the transfer authorized by the new act rested on two points:

   (1) "[T]he transfer to nonpension purposes of existing money in the State Pensions Fund is an impairment of pension benefits and contract rights prohibited by [the State and Federal Constitutions], and the new Act does not address and continues to violate the Plaintiffs' constitutionally-protected pension and contract rights"; and

   (2) "the legislative finding upon which the transfer is based—that the monies in the State Pension Fund are excess monies—is totally contradicted by fact and therefore unreasonable, arbitrary and capricious."

The circuit court denied plaintiffs' motion for a TRO, but certified an issue for interlocutory appeal by permission, pursuant to Supreme Court Rule 308 (134 Ill. 2d R. 308). The certified question was whether the transfer of $21 million pursuant to Public Act 87—838 violated certain provisions of the Illinois or Federal Constitutions. In certifying the question the court made the requisite finding under Rule 308 that its order involved a question of law as to which there was a

substantial ground for difference of opinion and that an immediate appeal might materially advance the ultimate termination of the litigation.

Plaintiffs did not perfect their interlocutory appeal pursuant to Rule 308; instead, they filed in the appellate court a notice of interlocutory appeal as of right, pursuant to Rule 307(a), from denial of their motion for a TRO. Simultaneously, plaintiffs filed in this court a motion for direct appeal and a motion to enjoin defendants from transferring the $21 million under the auspices of Public Act 87—838. In May 1992, this court granted direct appeal but denied plaintiffs' motion to restrain the transfer of moneys from the State Pensions Fund to the general revenue fund. Subsequently, the transfer took place. Defendants thereafter moved to dismiss the instant appeal as being moot. Defendants' motion to dismiss was denied.

## ANALYSIS

### I.

*Attorney General's Representation of Nominal Defendants*

In appeal No. 74181, plaintiffs appeal from the circuit court's order denying plaintiffs' motion to disqualify the Attorney General, on grounds of conflict of interest, from representing three of the retirement systems, which are nominal defendants, as well as the State defendants. The State defendants maintain their right to divert funds from the State Pensions Fund to the general revenue fund. This position runs counter to the interest of the retirement systems to prevent the State from evading its mandate to restore the State Pensions Fund to sound financial footing. Accordingly, plaintiffs contend, the Attorney General cannot properly represent both the State defendants and the retirement systems.

In the instant case, two of the retirement systems are being represented by independent private counsel appointed as special assistant Attorneys General. We approve of this procedure, which clearly removes the taint of perceived conflict. Plaintiffs have no objection to the representation of special assistant Attorneys General but object to the Attorney General's continued representation of the remaining three retirement systems.

The Attorney General's power and duties as the legal officer of the State underlie the nature of his counsel in this case. (See *Environmental Protection Agency v. Pollution Control Board* (1977), 69 Ill. 2d 394, 398-99.) The Illinois Constitution of 1970 requires the Attorney General to represent the State, and this duty extends to the representation of State agencies. (*Environmental Protection Agency*, 69 Ill. 2d at 399.) Moreover, as long as the Attorney General is not an actual party, or interested as a private individual, he or she may represent opposing State agencies in a legal dispute. (*Environmental Protection Agency*, 69 Ill. 2d at 401.) That is so because the Attorney General serves the broader interests of the State rather than the particular interest of any agency.

We believe that the Attorney General in this case properly represents the interests of the State defendants acting in their official capacities. In the role of counsel to the State, the Attorney General may represent the three retirement systems as entities of the State, which receive State moneys for the payment of pension benefits to State employees. However, that is not to say that the Attorney General is representing the interests of the *participants in and beneficiaries of* the five retirement systems; clearly, plaintiffs and their counsel are representing the interests of the persons for whom the funds were established. While there is an apparent conflict between the interests of the State defendants (to

divert the pension funds to other uses) and the responsibilities of the retirement systems (to regain financial stability in order to meet current and future pension obligations), we do not believe that the Attorney General's legal representation of three of the retirement systems will result in prejudice to any of the parties to this litigation. Plaintiffs are seeking relief on behalf of themselves and the class of people who are participants in or beneficiaries of the five retirement systems. To the extent plaintiffs' interests are coextensive with that of the nominal defendants, the retirement systems, plaintiffs are capable of continuing their advocacy unaffected by the Attorney General's representation. If plaintiffs prevail in their lawsuit the recovery would run to the retirement systems.

We also note that none of the three retirement systems in issue have joined in plaintiffs' motion to disqualify the Attorney General or otherwise objected to his representation in this lawsuit, notwithstanding an ambiguous vote of the trustees of one of the affected systems to engage "outside" counsel. The vote to engage other counsel did not, ultimately, carry. We hold that the circuit court did not err in denying plaintiffs' motion to disqualify the Attorney General.

## II.

### Denial of Motion for Temporary Restraining Order

The primary relief that plaintiffs seek in this court is reversal of the trial court's denial of their motion for a TRO on the ground that Public Act 87—838 is unconstitutional, for the following reasons: (1) the Act is an invalid attempt to amend a substantive law by an appropriations bill; (2) alternatively, if the Act is viewed not as an appropriations bill but as a substantive bill, it violates the "single-subject" rule of the Illinois Constitution; (3) the State's transfer of moneys from the State

Pensions Fund to the general revenue fund is an unconstitutional impairment of pension benefits; and (4) even if Public Act 87—838 did not impair plaintiffs' pension contract rights, the legislative finding of "excess moneys" in the State Pensions Fund was an irrebuttable presumption that violated the plaintiffs' right to due process.

Defendants challenge the justiciability of the controversy at bar, asserting that the plaintiffs lack standing to sue and that the appeal is moot because the transfer of funds has occurred. In addition, defendants interpose a waiver issue premised on the fact that plaintiffs do not specifically argue that the trial court abused its discretion in denying the motion for a TRO. Reaching the merits, defendants contend that Public Act 87—838 is a valid, substantive enactment of the legislature, not a true appropriation, and that the current members of the General Assembly are not bound by decisions of prior legislators with respect to the use of public funds in special accounts. Further, defendants contend that the Illinois Constitution's pension contract clause does not endow members of retirement systems with a contractual right to require a specific level of funding, and therefore the alleged diminution of pension funds is not an unconstitutional impairment of contract rights. Defendants also argue that plaintiffs do not have a contractual right to the use of the State Pensions Fund, notwithstanding language in the State Finance Act that dedicates the proceeds of unclaimed property to the reduction of accrued actuarial reserve deficiencies in the State retirement systems. Finally, defendants state that the legislative finding of excess funds in the State Pensions Fund was not inaccurate under the circumstances and does not afford plaintiffs a base upon which to attack the validity of the Act.

This court finds itself in the untenable position of

reviewing plaintiffs' vital constitutional challenges in the context of an interlocutory appeal from the denial of a motion to enjoin State officials from undertaking acts that the legislature and chief executive officer of this State deemed necessary to balance the budget of the State of Illinois for fiscal year 1992. The judicial branch of the government is not charged with political or legislative decisionmaking and its role in the government's balance of powers has certain defined limits. One of these limits is refraining from striking down legislation unless it offends the State or Federal Constitutions. We agree with plaintiffs that the judicial branch of government must ultimately decide whether the challenged provision of Public Act 87—838 is constitutionally sound. However, we agree with defendants that the specific, much narrower issue on appeal—whether the transfer of $21 million should have been temporarily enjoined by the circuit court—has been rendered moot by the actual transfer of the funds in question.

Plaintiffs urge this court to apply the public interest exception to the mootness doctrine (see, *e.g.*, *People ex rel. Wallace v. Labrenz* (1952), 411 Ill. 618, 622) because there is a substantial public interest in this court's determination of the validity of the transfer and the issue may recur at any time the legislature faces another shortfall and must search for funds to balance the budget.

Plaintiffs' contention is not without merit; however, a basic tenet of justiciability holds that "[r]eviewing courts will not decide moot or abstract questions or render advisory opinions. Courts of review ordinarily will not consider issues where they are not essential to the disposition of the cause or where the result will not be affected regardless of how the issues are decided." (*Barth v. Reagan* (1990), 139 Ill. 2d 399, 419; see also *Condon v. American Telephone & Telegraph Co.* (1990),

136 Ill. 2d 95, 99 (reviewing courts will not consider issues merely to establish precedent).) Moreover, this court will not address constitutional issues that are unnecessary for the disposition of the case under review (*Anundson v. City of Chicago* (1970), 44 Ill. 2d 491, 499), even though the court acquires jurisdiction of the case because a constitutional question is involved (*Stigler v. City of Chicago* (1971), 48 Ill. 2d 20, 22).

In the instant case, our opinion as to the validity of the transfer of funds will not affect that which has already occurred—the transfer of $21 million out of the State Pensions Fund pursuant to the Emergency Budget of Fiscal Year 1992. However, our opinion on certain of the constitutional issues raised—particularly those concerning the impairment of plaintiffs' pension contracts—might influence or even foreclose the circuit court from deciding similar issues that are currently pending in that court. The purpose of temporary injunctive relief is to prevent a threatened wrong or injury pending a full hearing on the merits, not to finally adjudicate the merits. (See *Toushin v. City of Chicago* (1974), 23 Ill. App. 3d 797, 801; *Spencer v. Community Hospital* (1975), 30 Ill. App. 3d 285, 287-88.) In *Spencer*, the plaintiff doctor sought preliminary injunctive relief to prevent the defendant hospital board from holding a disciplinary hearing. The circuit court denied plaintiff's motion and the hearing took place. Subsequently, the appellate court dismissed the appeal as moot, but stated, "The finding of the trial court denying the preliminary injunction is not dispositive of the merits of the case, and plaintiff is not foreclosed from a full and complete hearing on all the issues contained in the complaint. [Citations.]" (*Spencer*, 30 Ill. App. 3d at 287-88.) The *Spencer* court further recognized that because the appeal was from a denial of preliminary injunction, the "sole question for review [was]

whether the trial court abused its discretion." (*Spencer*, 30 Ill. App. 3d at 287.) We conclude that, in the instant case, the circuit court retained substantial discretion in declining to enter the TRO at that stage of the proceedings. Plaintiffs' assertion of constitutional challenges did not compel the trial court to grant or deny temporary injunctive relief. As the *Toushin* court stated, "While the [constitutional challenge to the ordinance in question] is a serious one [citation], *normally an attack on the constitutionality of a statute should not be resolved upon application for a temporary injunction.* [Citations.]" (Emphasis added.) *Toushin*, 23 Ill. App. 3d at 803.

We acknowledge the seriousness of the plaintiffs' constitutional challenges to the transfer of funds pursuant to Public Act 87—838, but we believe that the merits of those challenges should be resolved in the first instance by the circuit court in its adjudication of the plaintiffs' suit for *mandamus*, declaratory judgment, and other relief. By its nature, provisional injunctive relief of the type sought in the instant appeal depends on numerous equitable concerns and is not available as a matter of right. We caution, however, that our decision to dismiss the earlier appeal and the instant appeal, for want of justiciability, is not to be taken as a judicial finding that the legislation in issue is constitutional.

Plaintiffs persist in urging this court to reach the merits of the appeal, for another reason: the circuit court, in denying their motion for a TRO, rejected their contention that Public Act 87—838 is unconstitutional. Therefore, plaintiffs contend, our dismissal of the appeal lets stand the circuit court's ruling and defeats plaintiffs' ability to obtain review of their constitutional challenges to the transfer of moneys from the State Pensions Fund to the general revenue fund. Apparently, plaintiffs are concerned that the circuit court based its order on the

belief that the transfer of funds was not prohibited by the impairment of contracts clauses of the State and Federal Constitutions. According to plaintiffs, the circuit court arrived at that conclusion based on its interpretation of this court's opinion in *People ex rel. Illinois Federation of Teachers v. Lindberg* (1975), 60 Ill. 2d 266.

*Lindberg* involved the Governor's authority to reduce appropriations set by the legislature to alleviate underfunding in several teacher pension funds. This court upheld the Governor's constitutionally derived authority to reduce appropriations and further noted that the participants in the State-funded teachers' pensions were not constitutionally entitled to specific levels of funding.

While we express no opinion regarding *Lindberg*'s application to the merits of the instant case, we do not believe that the circuit court's denial of temporary injunctive relief is in any way determinative of that court's ability to reach a final adjudication of the merits of plaintiffs' pending lawsuit. If plaintiffs prevail on all or part of their case, the circuit court is the proper body to fashion whatever relief may be appropriate. The issues that have been framed in the instant appeal appear to differ significantly from the issue decided in *Lindberg*. We cannot assume that plaintiffs have been precluded by the circuit court's remarks from fully presenting and arguing the merits of their claims. (See *Spencer*, 30 Ill. App. 3d 285.) In the case at bar, the circuit court denied the motion for a TRO at a time when plaintiffs had not yet amended their complaint to add a count specifically directed at the newly enacted Public Act 87—838. The circuit court had the benefit of some, but not all, of the constitutional arguments that the parties have subsequently developed as part of this appeal. For that reason we decline to render what can only be an advisory opinion, in light of the fact that the

transfer of funds authorized by Public Act 87—838 has occurred and can no longer be enjoined. All other issues remain in the circuit court and are for that court to decide in the first instance, after full consideration of the merits.

For the reasons set forth, we affirm the decision of the trial court in No. 74181, and we dismiss the appeal from the denial of the TRO in No. 73485.

*No. 73485—Appeal dismissed.*
*No. 74181—Affirmed.*

JUSTICE FREEMAN, concurring in part and dissenting in part:

The majority rightly concludes that the Attorney General's appearance on behalf of the retirement systems does not create a disqualifying conflict of interest. I might add that, being duty bound to represent this State's agencies as well as its officers, the Attorney General's involvement is compelled. (See *Environmental Protection Agency v. Pollution Control Board* (1977), 69 Ill. 2d 394, 399; see also Ill. Rev. Stat. 1991, ch. 108¹/₂, par. 14—139 (specifically naming the Attorney General the legal advisor of the board of trustees of the State Employees' Retirement System).) After all, the pension systems are the equivalent of State agencies to the extent they are, like agencies, "bod[ies] politic and corporate" (Ill. Rev. Stat. 1991, ch. 108¹/₂, par. 22—401) with rulemaking authority (Ill. Rev. Stat. 1991, ch. 108¹/₂, pars. 2—143 (General Assembly), 14— 135.03 (State employees), 15—177 (State universities), 16—168 (teachers), 18—150 (judges)). They are, therefore, like State agencies, subject to the requirements of the Administrative Procedure Act (Ill. Rev. Stat. 1991, ch. 127, par. 1003.01). And, like State agencies, the systems are subject to the Illinois State Auditing Act (Ill. Rev. Stat. 1991, ch. 15, par. 301—14).

The derivative nature of the action, of course,

insures that the Attorney General's dual involvement will not compromise the interests of the participants and beneficiaries of the pension systems. Any remedy will come about because the issues are pressed by the representative plaintiffs, not the Attorney General. See *Metropolitan Sanitary District of Greater Chicago ex rel. O'Keeffe v. Ingram Corp.* (1981), 85 Ill. 2d 458, 475 (involving an individual's appeal on behalf of the Metropolitan Sanitary District of Greater Chicago).

So much for the good.

The majority dismisses the appeal, reasoning no determination of the transfer's constitutional legitimacy could undo it, noting, for good measure, the interlocutory status of the matter. The decision is wrong both legally and because it stands as a sign of willingness to weigh political expediency in crafting the constitutional jurisprudence of this State. I dissent to that portion of today's decision.

The "untenable" position the majority describes— asked to assay constitutional challenges on a moot issue upon denial of a TRO—should be no surprise. This court took an active hand in creating the situation. Once eager to reach the merits, the court twice before granted direct appeal, ignoring the matter's interlocutory status. Given that the court did not restrain the transfer when, in May 1992, it allowed the second direct appeal, not one thing has made the matter any less justiciable.

It may be that policies behind the mootness doctrine are compelling regardless of when the mooting event occurred (*Madison Park Bank v. Zagel* (1982), 91 Ill. 2d 231, 236, citing *Brownlow v. Schwartz* (1923), 261 U.S. 216, 67 L. Ed. 620, 43 S. Ct. 263) and that some issues may not lend themselves to clean adjudication in an interlocutory appeal. But the history of this case certainly dispels any notion that there is cause for consternation.

More importantly, the reasons offered for dismissing the case do not command that outcome.

The two appellate decisions the majority relies on with regard to interlocutory appeals do not pertain to cases involving issues of a nature and scope as those here. The case of primary focus, *Spencer v. Community Hospital* (1975), 30 Ill. App. 3d 285, did not involve any question of constitutional import, let alone a facial attack on legislation. The other, *Toushin v. City of Chicago* (1974), 23 Ill. App. 3d 797, did involve such an attack, but, unlike here, the challenge did not promise disposition of the entire case (*Toushin*, 23 Ill. App. 3d at 803 (noting that even if the owner of a "sensitivity center" prevailed in an interlocutory appeal which challenged the constitutionality of legislation regulating massage parlors, activities at the center could be enjoined as a public nuisance)).

This court has often cautioned against unnecessarily reaching constitutional questions where the case may be resolved on other issues. (See, *e.g.*, *People ex rel. Waller v. 1990 Ford Bronco* (1994), 158 Ill. 2d 460, 464, citing *Exchange National Bank v. Lawndale National Bank* (1968), 41 Ill. 2d 316, 321.) That caution, warranted in cases involving an assertion of a violation of constitutionally protected rights, is less compelling where a facial attack on legislation is made. The reason: legislation unconstitutional on its face is void, not merely voidable. See *In re Contest of the Election for the Offices of Governor & Lieutenant Governor* (1983), 93 Ill. 2d 463, 471.

In embracing the mootness doctrine, the majority declines to consider whether an exception for cases involving questions of public interest might apply. (See, *e.g.*, *People ex rel. Wallace v. Labrenz* (1952), 411 Ill. 618, 622; see also Annot., 132 A.L.R. 1185 (1941).) Instead of analysis, the majority recites the usual reasons for declining to address moot questions.

The majority has it backwards. The admonishments

against deciding moot questions do not explain why the public interest exception should not be considered. Rather, it is that the admonishments exist that an analysis into whether the exception is applicable is necessary. (See *People ex rel. Wallace v. Labrenz*, 411 Ill. at 622-23 (noting first why courts do not consider moot questions and then considering whether criteria relevant to the public interest exception are met).) Were it otherwise, the admonishment against reviewing moot questions because they permit, at most, advisory opinions would swallow up one of the very reasons for the public interest exception: the need to guide public officers in the future. See *People ex rel. Wallace v. Labrenz*, 411 Ill. at 622.

Had the majority addressed the relevant considerations, I submit, it would have been impossible to deny that the requisite public interest exists to apply the exception. I might point out that this court has readily found such interest reason to reach moot questions not remotely as sweeping as the constitutional ones raised here.

Most recently, the court has done so to determine whether the Mental Health and Developmental Disabilities Act calls for mandatory scheduling of certain hearings which had already been set. (*Radzewski v. Cawley* (1994), 159 Ill. 2d 372, 376-77.) Other deserving instances have included an election contest over a judicial vacancy which had been filled (*Bonaguro v. County Officers Electoral Board* (1994), 158 Ill. 2d 391, 395), a charge of juvenile neglect against a mother for refusing a blood transfusion where the child had reached majority (*In re E.G.* (1989), 133 Ill. 2d 98, 105-06), a constitutional challenge to one section of the Public Community College Act raised by an unaffected *amicus* (*Spaulding v. Illinois Community College Board* (1976), 64 Ill. 2d 449, 454-55), an attempt by electors to

"void" a town meeting where the matters to be tabled had already won unanimous approval or were resolved by statutory amendment (*Thompson v. Conti* (1968), 39 Ill. 2d 160, 165-66), and actions to force Jehovah's Witnesses to submit to blood transfusions after they had been given (*In re Estate of Brooks* (1965), 32 Ill. 2d 361, 364-65; *People ex rel. Wallace v. Labrenz*, 411 Ill. at 622-23).

And even where the court has dismissed an appeal as moot, it has done so with at least a cursory statement indicating it has found no public interest in the case to allow for the exception. (See, *e.g.*, *George W. Kennedy Construction Co. v. City of Chicago* (1986), 112 Ill. 2d 70, 77; *Wheatley v. Board of Education of Township High School District 205* (1984), 99 Ill. 2d 481, 485; *In re Marriage of Wright* (1982), 89 Ill. 2d 498, 500.) But not here.

Guidance in determining whether the requisite public interest exists was noted over 40 years ago in *People ex rel. Wallace v. Labrenz*, 411 Ill. at 622. Although the listing of criteria there was inexhaustive, three factors were offered: (1) the question is of a public, not a private, nature; (2) good reason exists to resolve it to guide public officers in the future; and (3) the question is one likely to recur. *People ex rel. Wallace v. Labrenz*, 411 Ill. at 622 (noting that those were "[a]mong" the relevant concerns).

Against those criteria, the requisite interest exists to decide at least two constitutional issues here, either of which is entirely dispositive of the case: (1) whether Public Act 87—838 is invalid in whole because it is not confined to one subject (see Ill. Const. 1970, art. IV, § 8); and (2) whether the transfer itself resulted in an impairment of contract rights (see Ill. Const. 1970, art. I, § 16; Ill. Const. 1970, art. XIII, § 5; U.S. Const., art. I, § 10).

Public v. Private Nature of the Questions

Both issues above are questions of a public nature.

Public Act 87—838, the Second Emergency Budget Act, as I detail later, amended several existing enactments in order to free revenue to balance the State budget. The amendments do not merely affect participants and beneficiaries of the State-funded pension systems. The possibility of other like challenges by affected individuals and entities across the State speaks to the public nature of the challenge to the Act on the whole.

As for the transfer, it was accomplished through legislation tailored by the General Assembly to empower the Governor to use funds from the systems to balance the State budget. The concern is whether, in that effort, there was disregard for other constitutional provisions. Questions involving the constitutional propriety of legislative action and executive authority, particularly those which touch on the financial affairs of an entire State, have long been recognized as reasons justifying the public interest exception. See 132 A.L.R. at 1190 (collecting cases).

But perhaps most significant is the simple fact that the pension systems now stand $21 million poorer after the transfer. Given the systems' precarious financial health—a fact, much later noted, about which this court is well aware—the public interest is underscored by this truth: the tax-paying citizenry of this State will bear the eventual burden of bailing out the systems from insolvency, an outcome made all the more predictable by such legislative maneuvering. It would be no small burden. The annual report of all State pension funds shows that, as of June 1993, there were 282,555 active members and 111,119 benefit recipients. Those numbers do not even reflect inactive members, that is, persons not yet retired owed pension fund benefits as a result of

former membership, but who have not sought distribution.

## Future Guidance of Public Officers

If any case could give reason to resolve issues to provide guidance for public officials it would be this one. The public officials here are the highest elected officers of this State's executive and legislative branches of government. The guidance which might be offered is nothing less than the determination of what legislation, if any, properly may affect constitutionally protected pension fund moneys. Measuring legislation against what is constitutionally required is, of course, the solemn responsibility of this court. *People ex rel. Keenan v. McGuane* (1958), 13 Ill. 2d 520, 531-32.

## Recurrence of the Question

It is doubtless that the guidance afforded in resolving the chal'enges raised would find quick and regular application. Balancing the State budget is, of course, an annual travail. Opportunity to resort to legislative maneuvering to overcome revenue shortfalls awaits only the next budgetary crisis. (See also *People ex rel. Bernardi v. City of Highland Park* (1988), 121 Ill. 2d 1, 8 (invoking a separate exception for moot questions capable of repetition but escaping review but noting the recurrence of the question with reference to the considerations for the public interest exception).) And, again, the extensive amendment of other legislation under the Second Emergency Budget Act leaves open the possibility of similar future attack.

The above considerations show the merits of this case should have been addressed. I endeavor to do so now, convinced that all parties anticipated such a resolution. There is also the chance that, in not doing so, the majority's declination to pass on the propriety of the denial of the TRO may be taken as reason to assume

there is nothing constitutionally onerous on the whole about the Second Emergency Budget Act. The possibility of similarly overlooking the constitutional legitimacy of the transfer, a separate concern, is less likely. Resolution of the transfer's legitimacy depends on the same constitutional provisions at issue in the pending litigation regarding the alleged underfunding of the systems.

The Second Emergency Budget Act of 1992

The Second Emergency Budget Act is peculiar both in structure and nature. It is one of a type of legislative measure that has before warranted this court's close scrutiny. (See *Fuehrmeyer v. City of Chicago* (1974), 57 Ill. 2d 193, 202-03.) The legislative aim is accomplished by fashioning new provisions as well as amending separately existing legislation, a scheme first encountered in *Turner v. Wright* (1957), 11 Ill. 2d 161. The concern with such measures is that they may violate the so-called "single- or one-subject rule," a command retained from the 1870 Constitution limiting the content of bills. See Ill. Ann. Stat., 1970 Const., art. IV, § 8, Constitutional Commentary, at 155 (Smith-Hurd 1971); Ill. Const. 1870, art. IV, § 13 ("No act hereafter passed shall embrace more than one subject").

The rule is intended to prevent abuses associated with including diverse legislation in one act (see Sramek, *State Statutes: The One-Subject Rule Under the 1970 Constitution,* 6 J. Marshall L. Rev. 359, 359-60 (1973)). Illinois courts have spent considerable effort to read the term "subject" (see, *e.g., Dee-El Garage, Inc. v. Korzen* (1972), 53 Ill. 2d 1) so as to square the command with its object.

The command is not a literal one: so long as the provisions of a bill are germane to the accomplishment of the purpose of the enactment, the limitation is satisfied. (*Dee-El Garage,* 53 Ill. 2d at 9-10.) Nor is it absolute: unlike the version contained in the 1870 Constitution,

the limitation in our modern constitution exempts certain bills from the requirement that all bills be confined to one subject. (Ill. Const. 1970, art. IV, § 8(d).) Relevant here, exempted are "bills for appropriations" and bills "for the *** revision *** of laws." Ill. Const. 1970, art. IV, § 8(d).

The Second Emergency Budget Act is neither.

The Act's first six sections are the new provisions. Of those, two are operative, empowering and directing State agencies to create "contingency reserves" for 1992 from funds formerly made available for agency use. (Pub. Act 87—838, §§ 15(a), (e), 20, eff. January 24, 1992.) The rest, and by far the great majority of the measure, is given to amending one or more sections of 39 separate acts. The amendments are of seven types: (1) permitting transfer of moneys to either the general revenue fund or the General Obligation Bond Retirement and Interest Fund (Pub. Act 87—838, §§ 110, 135, 140, 150, 155, 165, 170, 175, 180, 185, 190, 195, 200, 205, 210, 215, 220, 225, 230, 235, 240, 250, 260, 270, 290, eff. January 24, 1992); (2) directing transfers to the general revenue fund alone (Pub. Act 87—838, §§ 100, 105, 190, 225, 230, 270, 275, 285, eff. January 24, 1992); (3) validating a July 1991 order of the Governor making such transfers (Pub. Act 87—838, § 225, eff. January 24, 1992); (4) prohibiting, from February through June 1992, normally permitted transfers from the general revenue fund (Pub. Act 87—838, §§ 245, 246, 247, 248, eff. January 24, 1992); (5) reducing required reserves in the school budget and permitting the reduced amount to be appropriated for any use (Pub. Act 87—838, § 253, eff. January 24, 1992); (6) empowering departments of State government to implement the contingency reserves called for in the Act (Pub. Act 87—838, §§ 110, 115, 120, 130, 275, 280, eff. January 24, 1992); and (7) reducing or increasing the amount of available grants in view of

those reserves (Pub. Act 87—838, § 255, eff. January 24, 1992).

Although the Second Emergency Budget Act certainly affects appropriated funds, it does not, like a true appropriations measure, authorize the expenditure of public moneys (Black's Law Dictionary 102 (6th ed. 1990)), for programs enacted through substantive legislation (see *Board of Trustees of Community College District No. 508 v. Burris* (1987), 118 Ill. 2d 465, 477-78, quoting *Illinois Municipal Retirement Fund v. City of Barry* (1977), 52 Ill. App. 3d 644, 646 (stating that an appropriation "involves the setting apart from public revenue a certain sum of money for a specific object")). True appropriations bills simply list, usually item by item, a specific amount of money payable for a specific use from a named source. (See, *e.g., People ex rel. Kirk v. Lindberg* (1974), 59 Ill. 2d 38, 41 (summarizing the provisions of such bills to include "appropriations for personal services, contractual services, commodities and the like").) Normal appropriations mark the end of the legislative process. See *Colorado General Assembly v. Lamm* (Colo. 1985), 704 P.2d 1371, 1380.

The Second Emergency Budget Act makes funds already appropriated for specific uses available for the more general one of balancing the State budget. It actually operates in reverse of an appropriations measure: moneys marked for special concerns are funnelled back to the general revenue fund. Incidentally, were the Act a true appropriations measure, it would be in danger of violating a different constitutional prohibition because it could not be used to amend substantive legislation. Ill. Const. 1970, art. IV, § 8(d); see *Benedict v. Polan* (1991), 186 W. Va. 452, 413 S.E.2d 107.

The Second Emergency Budget Act fares no better under the exemption for bills "for the revision of laws" although, as it is, in part, an amendatory measure, it

necessarily revises laws. (See Black's Law Dictionary 1187 (6th ed. 1990) (defining "revise," in part, as "[t]o go over a thing for the purpose of amending ***; as, to revise statutes").) Simply, the exemption must contemplate more than mere inclusion of amendatory provisions in a bill. If that were not the case, the limitation of the single-subject rule would be easily avoided where any bill contained at least one such provision.

Similar legislation was struck down in *Fuehrmeyer v. City of Chicago* (1974), 57 Ill. 2d 193. That legislation was designed to give the State exclusive regulatory power over the licensing of certain professions. The operative provision empowering the State was followed by enumeration of the separate acts there amended. (See *Fuehrmeyer*, 57 Ill. 2d at 195.) This court invalidated the act, in part, in view of the single-subject rule, after rejecting the notion that the act constituted a revision of law. See *Fuehrmeyer*, 57 Ill. 2d at 202.

Like the act in *Fuehrmeyer*, the Second Emergency Budget Act operates, in dominant part, by similarly amending numerous separate acts to achieve an objective larger than the objective of any one of them. In *Fuehrmeyer*, the goal was empowering the State to control licensing. Here, it is balancing the State budget.

Such bills are not saved from the strictures of the single-subject rule. Were it otherwise, a generally stated scope of legislative objective would be sufficient to displace the constitutional limitation. That, by the way, is the key to understanding the exemption for bills that revise law. It is not enough that amendments contained in legislation be germane to a common objective; the amendments must also be interrelated for that purpose.

The common objective of the amendments contained in the Second Emergency Budget Act is to free revenue to balance the State budget. Each amendment can be said to be germane to that end. But the amendments,

the heart of the Act, are not otherwise interrelated. Those provisions are instead related to the other provisions contained in the 39 separate acts in which the preamended provisions are found. See *Fuehrmeyer*, 57 Ill. 2d at 203.

For those reasons, I believe the Second Emergency Budget Act violates article IV, section 8(d), of this State's constitution, which requires all bills to be confined to one subject. And because the legislation is constitutionally deficient on its face, it, as well as the transfer effected by it, is void.

### The Transfer of Pension Fund Moneys

The ability to transfer pension fund moneys was created through several amendments to the State Finance Act (Ill. Rev. Stat. 1991, ch. 127, par. 141), one of the 39 measures affected by the Second Emergency Budget Act.

Section 5 of the State Finance Act had been amended under the First Emergency Budget Act to permit the Governor to transfer from "special funds" in the State Treasury up to $50 million to the general revenue fund until July 1992 (Pub. Act 87—14, § 2—18(d), eff. July 24, 1991), the State Pensions Fund (Ill. Rev. Stat. 1991, ch. 127, par. 144.12) being one such special fund (Ill. Rev. Stat. 1991, ch. 127, pars. 141(a), 141.54). Further amendment of section 5 under the Second Emergency Budget Act relaxed the earlier restrictions on such transfers in view of a legislative declaration that excess moneys existed in the special funds. Pub. Act 87—838, § 5, eff. January 24, 1992; Pub. Act 87—838, § 270, eff. January 24, 1992.

In addition, section 8.12 of the State Finance Act (Ill. Rev. Stat. 1991, ch. 127, par. 144.12) was amended to permit pension fund moneys to be transferred to the general revenue fund "notwithstanding any restriction on the use of" the State Pensions Fund. (Pub. Act 87—838, § 270, eff. January 24, 1992.) The Comptroller and

Treasurer were specifically directed to effectuate a transfer of up to $21 million to the general revenue fund on February 1, 1992. Pub. Act 87—838, § 270, eff. January 24, 1992.

In affecting funds designated for reducing the unfunded liability of the systems, the concern is that the transfer impaired constitutionally protected pension benefits or contract rights. That challenge is narrower than the constitutional challenge to the Second Emergency Budget Act on the whole. Even so, as alluded to above, the question of impairment is common to both the issue of the transfer and the alleged overall underfunding of the systems, the subject of pending litigation. A concern, then, is whether an analysis of the transfer against impairment protections might taint resolution of issues in the pending litigation.

But even the majority realizes that the propriety of the transfer and the alleged overall underfunding present different concerns. In fact, the Pension Code, not the State Finance Act, lies at the root of the pending litigation. (See Ill. Rev. Stat. 1991, ch. 108$^1$/$_2$, pars. 2—124 (General Assembly), 14—131(f) (State employees), 16—158(b) (teachers), 18—131(2) (judges) (all amended by Pub. Act 86—273, § 1, eff. August 23, 1989); Ill. Rev. Stat. 1991, ch. 108$^1$/$_2$, par. 15—155(a) (State universities) (amended by Pub. Act 86—1034, § 1, eff. March 2, 1990; Pub. Act 87—794, § 1, eff. November 19, 1991).) In short, that the issues may be resolved, in part or whole, against the same constitutional provisions is no impediment to resolution of the transfer's propriety now.

Several further observations are necessary.

This State's constitution provides, in article XIII, section 5:

> "Membership in any pension or retirement system of the State *** shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired." (Ill. Const. 1970, art. XIII, § 5.)

Implicated here is the protection against impairment, rather than the protection against diminution, as plaintiffs have yet to actually receive any benefits.

The protection against impairment of State pension benefits is co-extensive with the protection afforded all contracts under article I, section 16, of the constitution. (Ill. Ann. Stat., 1970 Const., art. XIII, § 5, Constitutional Commentary, at 302 (Smith-Hurd 1971); see generally *Buddell v. Board of Trustees, State University Retirement System* (1987), 118 Ill. 2d 99, 102.) But to avoid rendering the general impairment-of-contracts provision surplusage where State pensions are concerned, that general provision's scope cannot include protection afforded membership in the systems here.

The drafters intended the protection afforded by our constitution to parallel that afforded under the constitution of New York. (See N.Y. Const., art. 5, § 7; *Kraus v. Board of Trustees of the Police Pension Fund* (1979), 72 Ill. App. 3d 833, 843.) Given the parallel construction, New York case law has proved a ready aid in determining the scope of protections afforded under our own constitutional provision. (*Buddell v. Board of Trustees, State University Retirement System* (1987), 118 Ill. 2d 99, 106-07; see also *Kraus*, 72 Ill. App. 3d at 844-45.) New York courts have consistently interpreted the protections to shield the source of funds for benefits not yet realized. See *Kraus*, 72 Ill. App. 3d at 844, quoting *Birnbaum v. New York State Teachers Retirement System* (1958), 5 N.Y.2d 1, 8-9, 152 N.E.2d 241, 245, 176 N.Y.S.2d 984, 989; *Sgaglione v. Levitt* (1975), 37 N.Y.2d 507, 511-12, 337 N.E.2d 592, 594, 375 N.Y.S.2d 79, 82-83 (specifically extending protection to reserve funds required to be maintained under retirement schemes).

Admittedly, the language of our own constitution's provision differs slightly from that of New York. The contractual relationship arising from State pensions

here is made "enforceable." No such mention is made in the New York provision. But, if a relationship entails duties and obligations attendant a contractual one, it must be subject to judicial enforcement, that being an elemental feature of all contracts. Our constitution merely makes plain what must be implied in the New York provision. The difference in no way prevents the same construction New York courts have given the scope of the protections there afforded from applying here.

The contract clause of the Federal Constitution, of course, remains a separate basis upon which to analyze the transfer's propriety. (See U.S. Const., art. I, § 10; *United States Trust Co. v. New Jersey* (1977), 431 U.S. 1, 17, 52 L. Ed. 2d 92, 106, 97 S. Ct. 1505, 1515.) I am, however, unaware of any material difference between the contract clause and the protection afforded under our own constitution. In fact, the primary reason the drafters of our constitution elevated pension membership to contract status was simply to eliminate distinction between mandatory and optional participation plans. *Buddell*, 118 Ill. 2d at 102.

Finally, I am aware that, as it is a "special fund," the General Assembly has authorized itself to "discontinue[ ]" the State Pension Fund, in which case the moneys are to be transferred to the general revenue fund. (Ill. Rev. Stat. 1991, ch. 127, par. 141(b) (also effecting a transfer based on the inactivity of any special fund for 18 months or longer).) That, however, is of no help in answering the impairment question in light of the specific constitutional protection afforded pension plan membership. The fund has never been discontinued, and so no opportunity has arisen to explore the constitutional legitimacy of such action. (See *United States Trust Co. v. New Jersey*, 431 U.S. at 24, 52 L. Ed. 2d at 111, 97 S. Ct. at 1518-19 (noting that, "[w]hatever

the propriety of a State's binding itself to a future course of conduct in other contexts, the power to enter into effective financial contracts [protected under the contract clause] cannot be questioned").) That an act purports to allow discontinuance of the fund does no more to immunize the transfer from constitutional attack than does the fact that the transfer itself was born of legislation.

Although the transfer presents a question of first impression here, other States have considered the same issue. (See *Dadisman v. Moore* (1988), 181 W. Va. 779, 384 S.E.2d 816; *Valdes v. Cory* (1983), 139 Cal. App. 3d 773, 189 Cal. Rptr. 212; *Weaver v. Evans* (1972), 80 Wash. 2d 461, 495 P.2d 639; see also *Singer v. City of Topeka* (1980), 227 Kan. 356, 607 P.2d 467; *Allen v. City of Long Beach* (1955), 45 Cal. 2d 128, 287 P.2d 765.) In the most analogous case, the Supreme Court of West Virginia held that a transfer to the general revenue fund of matching State funds appropriated for a public employees' retirement program was an impairment of contract against the test set out in *Allied Structural Steel Co. v. Spannaus* (1978), 438 U.S. 234, 57 L. Ed. 2d 727, 98 S. Ct. 2716. (*Dadisman*, 181 W. Va. at 790, 384 S.E.2d at 827, quoting *Wagoner v. Gainer* (1981), 167 W. Va. 139, 154-55, 279 S.E.2d 636, 645-46.) Pension participants, it was reasoned, have a vested interest in the integrity and security of the funds to pay future benefits notwithstanding that the legislative action may not have resulted in out-of-pocket losses. *Dadisman*, 181 W. Va. at 791, 384 S.E.2d at 828 (citing *Valdes*, 139 Cal. App. 3d 773, 189 Cal. Rptr. 212, *Weaver*, 81 Wash. 2d 461, 495 P.2d 639, and *Dombrowski v. City of Philadelphia* (1968), 431 Pa. 199, 245 A.2d 238, and rejecting *Kosa v. Treasurer* (1980), 408 Mich. 356, 292 N.W.2d 452 (drawing distinction between the right to receive pension benefits and the funding method adopted to assure the availabil-

ity of moneys to pay benefits)); see generally *Sgaglione*, 37 N.Y.2d at 512, 337 N.E.2d at 594, 375 N.Y.S.2d at 83.

The United States Supreme Court has long held that the contract clause of the Federal Constitution limits the power of the States to modify their own contracts. (*United States Trust Co. v. New Jersey*, 431 U.S. at 17, 52 L. Ed. 2d at 106, 97 S. Ct. at 1515.) But because the clause does not prohibit, generally, a State from amending statutes, the Court has observed a need to determine, first, whether what is arguably impaired is a contractual obligation. (*United States Trust Co. v. New Jersey*, 431 U.S. at 17, 52 L. Ed. 2d at 106, 97 S. Ct. at 1515.) Reason for such concern does not exist here, for membership in the pension systems is, as pointed out above, specifically granted contractual status under our constitution. The concern then becomes whether the transfer was a substantial impairment not otherwise justified by use of this State's reserved power as sovereign to safeguard the welfare of its citizens. *Allied Structural Steel Co.*, 438 U.S. at 244-45, 248-49, 57 L. Ed. 2d at 736-37, 739, 98 S. Ct. at 2722-23, 2724; *United States Trust Co. v. New Jersey*, 431 U.S. at 21, 25, 52 L. Ed. 2d at 109, 112, 97 S. Ct. at 1517, 1519.

There is, however, one other facet of the reserved-powers doctrine where a State's own contract is at issue, as here: a State cannot contract away an "essential attribute" of its sovereign power. (*United States Trust Co. v. New Jersey*, 431 U.S. at 23, 52 L. Ed. 2d at 110, 97 S. Ct. at 1518.) For that reason, a State's power to create irrevocable contract rights is of concern. (*United States Trust Co. v. New Jersey*, 431 U.S. at 23, 52 L. Ed. 2d at 110, 97 S. Ct. at 1518.) But States are regularly held to their debt contracts, the Court recognizing that mere financial obligations do not compromise reserved powers. *United States Trust Co. v. New Jersey*, 431 U.S. at 24-25, 52 L. Ed. 2d at 111, 97 S. Ct. at 1519.

In fact, the usual deference to any legislative assessment of the reasonableness and necessity of an impairment is not even appropriate when a State's financial self-interest is at stake. (*United States Trust Co. v. New Jersey*, 431 U.S. at 26, 52 L. Ed. 2d at 112, 97 S. Ct. at 1519.) The reason: contract clause protection would evaporate in the face of a legislative declaration that an important public purpose justified reduction of the State's financial obligations. (*United States Trust Co. v. New Jersey*, 431 U.S. at 26, 52 L. Ed. 2d at 112, 97 S. Ct. at 1519.) That is to say, the need for money is simply no excuse for affecting a State's contractual obligations. See *Lynch v. United States* (1934), 292 U.S. 571, 580, 78 L. Ed. 1434, 1441, 54 S. Ct. 840, 844.

The amendment effectuating the transfer here substantially impaired pension benefits. If this State's constitutional provision is to have meaning in the here and now, it must include, as the West Virginia Supreme Court similarly reasoned, protection of pension source moneys. Of those source moneys, a full $21 million was permanently affected by the transfer. That the funds cannot be restored to the systems, as the record indicates, is little reason to ignore the impairment caused by the transfer under both article XIII, section 5, of the Illinois Constitution and the contract clause of article I, section 10, of the United States Constitution. Ill. Const. 1970, art. XIII, § 5; U.S. Const., art. I, § 10.

As important as balancing the State budget is, what this State's constitution requires in that regard is not to be elevated above concern for impairing pension benefits. The inability to meet what one provision of the constitution mandates provides no excuse to violate another.

Nor can the legislative finding that excess moneys existed in the special funds—an excess, it must be remembered, recognized only after plaintiffs challenged

the First Emergency Budget Act—legitimize the impairment. As noted above, legislative findings (see generally *Donovan v. Holzman* (1956), 8 Ill. 2d 87, 96) count for nothing if used as means merely to avert constitutional protections in furtherance of the State's self-interest (see *Sanelli v. Glenview State Bank* (1985), 108 Ill. 2d 1, 27; *United States Trust Co. v. New Jersey*, 431 U.S. at 25-26, 52 L. Ed. 2d at 111-12, 97 S. Ct. at 1519).

And, though I remain skeptical such excess ever existed, that fact, too, is immaterial. The Governor and General Assembly could always find a use for extra money to balance the budget, especially when the alternative is raising taxes at the expense of angering the electorate. (See *United States Trust Co. v. New Jersey*, 431 U.S. at 26, 52 L. Ed. 2d at 112, 97 S. Ct. at 1519.) But protection of pension benefits under our constitution and the contract clause of the Federal Constitution would mean little at all were such a declaration of excess reason to impair this State's financial obligation to the pension systems. (See *United States Trust Co. v. New Jersey*, 431 U.S. at 26, 52 L. Ed. 2d at 112, 97 S. Ct. at 1519.) I note, as an interesting post-script on the point, that this court acknowledged in its 1993 annual report to the General Assembly (see Ill. Const. 1970, art. VI, § 17) that the Auditor General has warned of "continued deterioration" of the pension systems' assets and implored the legislature to address the problem. Unfortunately, both for plaintiffs' immediate interests as well as the constitutional jurisprudence of this State, the majority ignores, even in the face of that acknowledgment, an absence of public interest to resolve the issues the parties briefed and argued.

JUSTICE HARRISON joins in this partial concurrence and partial dissent.